# SMITH v. SANDERS et al.

No. 7024.   Decided February 10, 1948.   (189 P. 2d 701.)

See 67 C. J., Waters, sec. 407.  Constitutionality of statutes as affect-
ing riparian rights, see note, 56 A. L. R. 277.  See, also, 56 Am. Jur. 744.

*Ellis J. Pickett,* of St. George, for appellants.

*Lamar Duncan,* of Salt Lake City, for respondent.

WADE, Justice.

E. Penn Smith, plaintiff and respondent herein, brought this suit against Moroni and Ervil Sanders, defendants and appellants herein, to determine his rights to water which arose in a spring and to an easement or a right of way for a pipeline over appellants' land and to restrain them from interfering with water which arose in said spring on land being bought by Smith and which was conveyed by means of a pipeline which traversed lands owned by appellants to the land being bought by respondent. From a judgment in favor of plaintiff, defendants appeal.

Smith is the assignee of a certificate of sale from the State Land Board of a certain "L" shaped tract of land in Washington County, Utah, consisting of three 40-acre tracts. The spring from which the water arises is located on one end of that tract and the pipeline conveys this water from one end of the state lands to the other over a strip of privately owned land which now belongs to Sanders where it connects with cabins located on the state lands now being bought by Smith. Appellants bought the privately owned land from Almorean Bagley who originally had some kind of interest in both the state and privately owned tracts involved in this suit. Almorean Bagley's half-brother, L. L. Bagley and his wife originally had a purchase contract with the State Land Board for the land Smith is now buying. In 1931, Almorean Bagley went into possession of these state lands. He later had an understanding or agreement with his brother that he was to have a half interest therein and proceeded to build cabins and by 1935 to install the pipeline in controversy herein from the spring to those cabins. He testified that he was told that the water from the spring belonged to the owner of the privately owned land, the lands

now owned by the Sanders, and was being used by him and that he therefore bought that 40-acre tract in 1931, in order to get the water right. He also testified that although he was the purchaser of the property, the owner conveyed this land to the National Security Corporation or National Safety Corporation (his brother being an officer of both corporations) to be held in trust for him and that in 1935 in pursuance of this trust such corporation conveyed the property to him. He insisted that his brother had no interest in the privately owned lands. He further testified that after he acquired this land he planted peach and fig orchards on it and used the water from the spring in their cultivation until 1936, when he left. In 1937, L. L. Bagley leased the state land to Smith and in 1939 L. L. Bagley entered into an agreement to sell the state land and the pipeline to Smith. At the time this agreement was entered into neither L. L. Bagley nor his wife had any interest in these lands because their contract of purchase had been cancelled by the State Land Board for failure to make the payments due. Smith's mother then entered into a contract of purchase with the State Land Board for these tracts and subsequently assigned this contract to Smith. Almorean Bagley sold the privately-owned tract and the pipeline which he had installed and which ran from the spring to the cabin to appellants who in 1945 cut into the pipeline on their land and placed taps in it and thereby conveyed the water onto their land.

The court found that Almorean Bagley and his half-brother, L. L. Bagley, were jointly interested in all the land now in possession of respondent and appellants at the time the pipeline was installed and the cabins built. That in 1935, the Safety First, Inc., a corporation of which L. L. Bagley was president, transferred the privately-owned land to Almorean Bagley but did not reserve a right of way for the pipeline; and that after the pipeline was constructed the waters from the spring were used, although perhaps not exclusively, for culinary and irrigation purposes in connection with the cabins on the state lands. The court also

found that neither the Sanders nor their predecessors in interest had used the water adversely to Smith or his predecessors for a period of seven years. The court concluded that the Sanders had no right or interest in the spring and that Smith had an easement over appellants' land for the pipeline conveying the waters from the spring.

It is Sanders' contention that the court erred in finding that they and their predecessors in interest had not obtained the right to the use of the water of the spring by a use adverse to respondent and his predecessors in interest for a period of more than seven years. They argue that the evidence is clear that the owners or those who held possession for the owners of what is now appellants' land used the waters of the spring in question here adversely to the original appropriator of the water who was then in possession of the land upon which the spring arises, and that this user continued over a period of more than seven years.

The record discloses that in 1925 or 1926, one Lynn Jarvis was in possession of the state lands when the spring was discovered for him at about that time and used it on the lands now possessed by Smith until 1926 or 1927. There is no evidence in the record, however, that Lynn Jarvis appropriated the waters from this spring in the manner required by our laws.

At the time that the water in controversy herein was discovered the only manner in which the right to acquire the use thereof could be initiated was by filing an application therefor with the State Engineer, and the only manner in which the water could be appropriated was either by approval of said application by the State Engineer or by decree of court in an appeal from a decision of the State Engineer rejecting such application. Unless there had been a valid appropriation of the water no one could obtain any rights to it by adverse user even under our decisions in *Hammond* v. *Johnson*, 94 Utah 20, 66 P. 2d 894, and *Wellsville East Field Irrigation Co.* v. *Lindsay Land & Livestock Co.*, 104 Utah 448, 137 P. 2d 634, which held the right to the use of appropriated water could be

obtained by adverse possession before our legislature in Session Laws of Utah, 1939, Ch. 111, amended Sec. 100-3-1, R. S. U. 1933, and prohibited the acquiring of the right to the use of either appropriated or unappropriated waters by adverse possession. Smith who filed an application for this water which was approved by the State Engineer on March 5, 1946, appears from the evidence to be the first legal appropriator of this water, and he now has the right to complete his appropriation, and make proof thereof before the State Engineer since there was no appeal from the State Engineer's decision approving the appropriation and that is the only method provided in the statute by which the State Engineer's decision may be reviewed.

Did the court err in finding that Smith is the owner of an easement over and across Sanders' land for the conveyance of this water through the pipeline and that respondent was entitled to an injunction restraining appellants from interference with the use of this easement?

It is Smith's contention that he obtained the easement over appellants' property by implied grant. He argues that at the time of the installation of the pipeline there was a unity of owenrship in both the servient and dominant estates; that when the unity of ownership was severed an implied grant arose because the servitude imposed before the severance was obvious and permanent, was in use and was reasonably necessary for the fair enjoyment of the other part of the estate.

Smith's argument assumes there was a unity of title at the time the pipeline was laid and that there was a severance of this title. However, the evidence does not sustain such an assumption. From the evidence it appears that since 1942 Smith has been in possession of the state lands under an assignment of a contract of purchase from the State Land Board. That prior to that time L. L. Bagley and his wife had the right to possession under a contract of purchase with the State Land Board. The state has always been the owner of the lands now claimed by Smith. At one time, L. L. Bagley had a contract to purchase that land

from the state, and during that time a corporation of which he was president obtained title to the privately owned tract, to be held, however, in trust for Almorean Bagley who was purchasing this property from the original owner. Thereafter, L. L. Bagley lost his interest in the state lands as a result of his failure to keep up the payments on his contract as they became due. At that time, the pipeline was on the private lands and the water was being conveyed across them to the state lands. After he had lost his interest in the contract to purchase he assigned such interest to Smith, and by the terms thereof expressly conveyed the pipeline and its right of way. If L. L. Bagley, at that time, had any interest in the pipeline or the right of way for the water, he expressly conveyed it to Smith.

Smith's claim is that when L. L. Bagley lost his interest in the state lands, since, prior to that time he had some interest in the privately-owned lands, and also some interest in the state lands, that constituted a unity of title, and when his interest reverted to the state it constituted a severance of the state lands, which resulted in an implied conveyance of this easement to the state.

These facts do not constitute an implied conveyance of this easement to the state. L. L. Bagley never owned or held title to either of these tracts of land; the National Safety Corporation of which he was president merely held the title to the private lands in trust for Almorean Bagley and the evidence does not disclose that L. L. Bagley had any interest therein, all he had was a contract to purchase the state lands, which he later lost for failure to live up to his contract. There was never any unity of ownership of this property, and therefore there could be no severance. Ordinarily a severance which results in an implied easement contemplates that one person being the owner of two tracts of land conveys only one of them; that while there was a unity of ownership a part of the property retained has been used for the benefit of the part conveyed under such circumstances that had the parties anticipated the later developments, they would have expressly granted an

easement with the part conveyed, and under such circumstances the law will imply an easement. Here there was no grant by L. L. Bagley of his interest in the state land, he lost that interest by his failure to keep up his payments. Smith does not claim his present interest through him, his interest is the result of another contract of purchase with the state. There is no reason, whatever, to believe that had the parties anticipated the situation as it later developed that L. L. Bagley would have expressly conveyed this pipeline and right of way if he had an interest therein to the state. Under the facts as they here exist there was no implied grant of this easement. Since there was never a unity of ownership of respondent's and appellants' lands there could not have arisen an easement by implied grant.

Although there could not have arisen an easement by implied grant, the court did find that L. L. Bagley was jointly interested with Almorean Bagley in the privately-owned land. We are unable to determine upon what grounds the court so found. We have carefully examined the record but find the evidence ambiguous on what interest, if any, L. L. Bagley had in such land. It may be that the court, thought the evidence pointed to a partnership project between L. L. Bagley and Almorean Bagley, or that there was an oral agreement between the two brothers that each was to have an interest in the other's land, which agreement was sufficiently performed to take it out of the statute of frauds. Of course if L. L. Bagley had an interest in the privately-owned land and the pipeline, then Smith obtained that interest when L. L. Bagley conveyed to him.

In view of the ambiguity of the evidence we are of the opinion that this case should be re-tried on the matter of Smith's rights to the pipeline and an easement over Sanders' land, and the parties be allowed, if they desire, to amend their pleadings to conform with whatever the true situation is. Smith's right to the water being clearly established, this issue is not to be retried.

Reversed and remanded for new trial in accordance with this opinion. Each party to bear his own costs.

McDONOUGH, C. J. concurs.

PRATT, Justice (concurring in the result).

I concur with the opinion of each of my learned associates, Mr. Justice WADE and Mr. Justice LATIMER in their holding the factual background of this case will not support an implied easement; and I believe, as they apparently do, that upon retrial the case will stand or fall upon the question of whether or not L. L. Bagley had an interest in the SE¼ NW¼ of section 20 which would enable him to make a transfer or an assignment of an easement across that quarter section. Plaintiff's title to the other quarter sections and his rights to use the water are not contingent upon his relationship to the Bagleys.

WOLFE, Justice (concurring in the result).

I concurr in the order remanding this case for a retrial, only on the matter of plaintiff's rights in the pipeline and to an easement over defendants' land. I concur in the finding that neither Sanders nor his predecessors in interest (who appear to include the Bagleys) obtained any right to the water conveyed by the pipeline through adverse use thereof. I also concur in the view of Mr. Justice LATIMER that no question of easement by implied grant was before the trial court and that if, on an appeal of this equity case, it can be considered as being before us there is nothing in the evidence which could form the basis of an implied easement for the reasons set out by Mr. Justice WADE and Mr. Justice LATIMER.

As to the questions of whether there is any evidentiary basis for the finding that the private land was held by the National Security Corporation and the Safety First, Inc., in trust for the Bagleys and whether from or independently of such fact the Bagleys were jointly interested in the private land, I express no opinion for the reason that the matter is remanded for further evidence in that regard. I

agree with Mr. Justice WADE that the grounds for the latter finding are nebulous; and with Mr. Justice LATIMER that the evidence on which a trust was found by the trial court is so ambiguous and contradictory as to create a serious doubt as to the establishment of the corporation as a trustee for the Bagleys.

LATIMER, Justice (concurring in the result).

I concur in the result.

The judgment of the trial court that plaintiff is entitled to the use of the water is amply supported by the record and this issue should not be involved when and if the action is re-tried.

While the parties have argued to this court the question of an easement by implied grant, I find nothing in the record that this was the theory adopted by the trial judge. Certainly the findings and judgment would not so indicate and, as announced by Mr. Justice WADE in his opinion, the facts would not justify any such conclusion.

I believe we need only concern ourselves with the questions of whether or not L. L. Bagley had an interest in the private ground, and the pipeline. If so, then plaintiff acquired this interest and he would be entitled to the use of the pipeline and the easement for maintenance, without interference by defendants. The problem of an easement by implied grant is not even suggested by the factual picture. If L. L. Bagley had no interest to convey, then plaintiff acquired nothing by implication or otherwise. If he did have an interest to convey, then plaintiff acquired it by purchase and not by implication.

In order to give the reader a better understanding of the facts out of which this controversy arises, I am including in this opinion a sketch of the land involved, showing the location of the respective 40-acre tracts and the course of the pipeline:

The record furnishes the following history of the state lands: On February 15, 1930, Edward D. Dunn entered into a contract with the State of Utah for the purchase of the four 40-acre tracts indicated on the sketch as "state lands." This contract was later assigned to L. L. Bagley, the date of assignment on the official document being incorrect. The contract was forfeited September 30, 1930, but was reinstated on January 5, 1933. On November 15, 1933, the contract was assigned to Elaine N. Bagley, wife of L. L. Bagley, and from that date until May 2, 1938, the holder of the contract was repeatedly notified by the State Land Board of default in the terms. On this latter date the contract was forfeited by the state for non-payment, and the contract was cancelled. On the 31st day of July, 1939, some 14 months after the state contract had been cancelled, L. L. Bagley sold the three 40-acre tracts to the plaintiff by a written contract. Included in the same contract was a sale of the pipeline and right of way across the private land for purpose of maintaining the water installations. Plaintiff subsequent to his purchase learned that the state contract had been cancelled, that his contract

with L. L. Bagley for purchase of the state lands was practically worthless, and that it had been sold to one Free. On February 10, 1941, plaintiff effected a settlement with Free and purchased the contract back from him. On the 20th day of February, 1941, plaintiff's mother entered into a contract with the state to purchase the same four 40-acre tracts, and on the 23rd day of January, 1942, she assigned the contract to the plaintiff. This contract is still in force and effect.

The abstract of title covering the private 40-acre tract, insofar as material to this decision, shows the following conveyances: On April 14 ,1931, Wallace B. Mathis and wife conveyed the property to the National Security Corporation. L. L. Bagley was president of that corporation. Approximately two years later and on the 2nd day of May, 1933, the National Security Corporation conveyed to the Safety First, Inc., a corporation. L. L. Bagley was also the president of this corporation. This latter corporation deeded the property to Almorean Bagley on July 8, 1935. The title remained in Almorean Bagley until he conveyed to defendants on May 2, 1945.

The trial court made two findings that I have grave doubts are supported by the present state of the record. The court found that the two corporations, the National Security Corporation and the Safety First, Inc., held the private ground in trust for both Almorean Bagley and L. L. Bagley. A finding was also made that Almorean Bagley and his half-brother L. L. Bagley were jointly interested in both the public and the private lands. I would have no difficulty in sustaining the trial court if the pleadings and evidence sustained these two findings. Neither would I encounter any difficulty in sustaining the latter finding if the evidence supported the former.

There are many facts and circumstances that indicate L. L. Bagley had an interest in the private ground and the pipeline. However, in my opinion they fail to establish the original trust relationship found by the trial court. It may be the trial judge had additional evidence upon which he

based his findings, but if so the record is not before us. It appears that a hearing was held on an order to show cause why a temporary injunction should not be issued. The court issued a temporary injunction preventing defendants from interfering with plaintiff's right to the use of the pipeline, but the evidence to sustain that order was not certified to this court.

If the evidence were sufficient to justify the court in finding that the corporations were holding the property in trust for both Almorean and L. L. Bagley then the facts detailed hereinafter in this opinion would be sufficient to sustain a finding that when the property was deeded to Almorean Bagley in 1935 the rights of L. L. Bagley were not extinguished.

The only evidence I can find in the record in regard to the trustee status of the corporations is the following given by Almorean Bagley:

"The National Security didn't own it. They were acting as trustee to preserve the title for three or four of us buying the ground.

"I didn't purchase it (private property) from the Safety First Corporation. The deed was given to me by the Safety First before that, but the property was mine from the beginning. It was being held in trust.

"They (the corporations) were the trustees for us fellows that were buying this ground, the way it was some of us owed money on the place, some of the fellows in Wyoming, and the title was transferred to the National Security Corporation, trustee, and when they paid for the ground the title was to be turned to them."

The evidence indicating part ownership by L. L. Bagley was substantially this: In 1931 Almorean Bagley went to St. George, Utah, to operate a venture for himself and his half-brother, L. L. Bagley. The operation involved use of the land under contract of purchase by L. L. Bagley, from the State of Utah. Some difficulty had previously arisen over the use of the water developed on the state land, and L. L. Bagley advised Almorean Bagley it would be necessary to obtain title to the private land to avoid difficulty. Almorean Bagley testified he bought the land for the purpose

of obtaining the water, but the title was taken in the name of the National Security Company. It is worthwhile noting that Almorean Bagley was unable to state whether or not stock in the National Security Company had been given the seller in consideration for the sale. Another significant fact is that although Almorean Bagley claimed this corporation held the property in trust for "three or four of us buying the ground," he named only two parties and the corporation assumed ownership of the property at least to the extent of selling approximately six acres. After holding the title for some two years, the National Security Company conveyed to the Safety First, Inc., and L. L. Bagley was the president of both companies. The record is silent as to the respective interests of either of the companies or the reasons for transfer. In 1935, the record shows the following transactions: On the 8th day of July, 1935, the Safety First Corporation deeded the property to Almorean Bagley; this deed was executed by L. L. Bagley as president of the corporation; on the 23rd day of July, 1935, L. L. Bagley executed a lease on the state lands to Almorean Bagley who had previously on the 10th day of July, 1935, mortgaged the private land, hypothecated the lease, to the Bank of St. George to secure a loan, the proceeds of which were used to improve the property.

In 1936, L. L. Bagley left St. George, and for all practical purposes, abandoned the project as, according to him, he left the property in charge of a woman secretary of the Utah-Idaho Sugar Company. In March, 1937, L. L. Bagley leased the premises including the state and private lands and water rights to plaintiff for a term of five years. This lease was signed and executed by L. L. Bagley only, as ostensible owner, and with the consent and approval of Almorean Bagley. Not only did Almorean Bagley permit the plaintiff to believe L. L. Bagley had the right to lease the property, he ratified his act in so doing by obtaining some supplies, and delivering them to plaintiff to comply with the lessor's obligation under the lease.

The lease arrangment apparently continued until 1939, at which time the state lands and pipeline and easement were sold to plaintiff by L. L. Bagley. This sale was known to Almorean Bagley, as the record shows he had a discussion with L. L. Bagley concerning the sale and a discussion with Free concerning Free's purchase of a questionable contract. Almorean Bagley took no steps to disaffirm the right of L. L. Bagley to sell the pipeline or easement. On the contrary, it can be fairly inferred from the record that, being aware of the deception practiced by L. L. Bagley, he made no claim that L. L. Bagley had no authority to sell and permitted the plaintiff to settle with Free. Certainly, up to this point of the dealings, Almorean Bagley had never denied L. L. Bagley's right to deal with the project as part owner, including both private and state property. Accordingly, if L. L. Bagley had no interest in the private ground, and pipeline, Almorean Bagley's acts and conduct were misleading and most unusual.

Plaintiff's settlement with Free was made in 1941, and so for four more years Almorean Bagley made no effort to interfere with plaintiff's use of the easement, made no claim to the pipeline, and never questioned L. L. Bagley's authority to sell. And as far as I can ascertain from the record, Almorean Bagley never at any time denied that he and his half-brother L. L. Bagley, were not jointly interested in the promotional venture. He did claim he purchased the pipe and paid for the private ground. The claim that he paid for the pipeline is considerably weakened by his admission that the pipe was paid for in 1945 from the proceeds of the sale of the private land. His claim that he paid for the private ground is inconsistent with other parts of his testimony where he states he paid no consideration to either corporation, that he was not sure whether or not Mathis took stock for his interest in the land, and that the consideration for the land, $2,040, was paid at a time when, according to his testimony he and other fellows owed money on the place and the National Security Company was to hold

the property until paid. The record negatives the fact that either of these corporations was paid.

All of these facts are detailed for the purpose of showing that for at least eleven years, both L. L. and Almorean Bagley had by acts and conduct dealt with the property as though each had an interest in the venture. L. L. Bagley's repeated exercise of ownership over the property and Almorean's acquiescence therein are inconsistent with a claim of absolute ownership in Almorean.

I believe I have detailed enough of the evidence to show why I believe this matter should be referred back to the trial court for further evidence. We have a situation where one half-brother sells the pipeline to plaintiff in 1939, and the other sells it to defendants in 1945. Part of the line is on state land which, at the time it was installed, was claimed by L. L. Bagley and part was installed on private land claimed by Almorean Bagley. The true relationship with respect to ownership and right to deal with the property should be developed. If the evidence establishes any legal or equitable right running to the present litigants, not presently pleaded, the trial court should permit the pleadings to be amended.

From the record before us, we are not concerned with the right of bonafide purchasers of the private land. Neither defendant claimed or testified that he purchased the land without knowledge of the easement. While the record title was in Almorean Bagley, there are references in the chain of title to L. L. Bagley and from 1937 to 1945, plaintiff was openly using the pipeline and easement to supply water to the cabins. Even in their answers defendants alleged they purchased the right to use the water which was collected and used on land being purchased by plaintiff, and alleged the purchase of the pipeline which they knew was partially on plaintiff's land. The bill of sale itself was sufficient to put the purchasers on notice that there might be a claim to the use of the line for conveying water to the cabins.