FAIRFIELD IRRIGATION CO. v. CARSON et ux.

No. 7670.  Decided September 10, 1952.  (247 P. 2d 1004.)

See 67 C. J., Waters, sec. 499. Right of appropriator to recapture escaped water. 56 Am. Jur., Waters, secs. 175 et seq.; 89 A. L. R. 210.

*Christenson & Christenson,* Provo, for appellant.

*Edward W. Clyde,* Salt Lake City. *George S. Ballif,* Provo, for respondent.

WADE, Justice.

From a judgment awarding plaintiff, Fairfield Irrigation Company, respondent here, the right to the use of the waters of two man-made artesian wells located on defendants' land northwest of Fairfield, Utah, defendants Mr. and Mrs. Carson appeal. They raise the question of how the right to the use of artesian well water could be acquired between the effective date of c. 100, S. L. 1903, and cc. 104 and 105, S. L. 1935, and the effect on such rights of abandonment and ceasing to use such waters for the statutory period.[1]

The Fairfield springs are the main source of water supply for domestic and irrigation purposes in that neighborhood. They produce from four and half to seven and a half cubic feet per second of water the year round and are located in a spring or basin area of an acre or more ground overlooking the town in the foothills from the northwest. The early settlers built a canal system through which they diverted and appropriated these waters to a beneficial use

[1]See C. L. U. 1888, sec. 2783, § 9; R. S. U. 1898, sec. 1262; S. L. 1903, c. 100, sec. 50; C. L. U. 1907, sec. 1288x23; C. L. U. 1917, sec. 3468; S. L. 1919, c. 67, sec. 6; R. S. U. 1933, sec. 100-1-4; S. L. 1935, c 104, sec. 100-1-4; S. L. 1939, c. 111, sec. 100-1-4; same section U. .C. A. 1943, and S. L. 1945, c. 134, sec. 100-1-4. R. S. U. 1898, sec. 1262, provides: "* * * when the appropriator * * * abandons or ceases to use the water for a period of seven years the right ceases;" and S. L. 1903 amends this provision by adding: "and thereupon such waters revert to the public and may be again appropriated as provided by this act;" The law remained that way until S. L. 1919 when the word "seven" was amended to read "five". In S. L. 1935, c. 104, sec. 100-1-4, this provision was again amended by adding: "provided, that nothing in this section shall apply to underground or subterranean waters." But that provision was removed by the 1945 amendment which went into effect on May 8th of that year.

for both irrigation and domestic purposes prior to 1900. These early settlers are the predecessors in interest to plaintiff which was incorporated in 1939 to operate the canal and culinary system and distribute such waters. There are many springs in this area of different elevations which produce a pond. Above this area coming from the northwest is a natural wash or ravine which passes through this spring area and although there is considerable fall as the ravine approaches the spring area proper, in the bottom of the ravine the ground is somewhat boggy and at times there have been springs several hundred feet up the ravine; but the ground on both sides is dry.

About 1895, the Sunshine Water Line Company dug a sump on the northeasterly bank of this ravine about 375 feet upstream from the spring area in which it collected the waters and pumped them through a pipe line to a mining camp at Sunshine about five miles away. Thereafter, in 1898, this company acquired 1.90 acres of land on the lower side of which the sump was located, and in 1900 to supplement its water supply it drilled the two wells in question. The well water flowed into the sump and was pumped from there to Sunshine. This pumping operation was discontinued in 1905 and the water line company allowed the taxes assessed against the 1.90 acres of land to become delinquent and to be sold to the county for taxes and the pump and pipe line were dismantled. Prior to ceasing operations, none of the well waters were used on the land where the wells were drilled and, after the pumping operations ceased, neither the company nor its successors in interest ever used the well water but it was allowed to overflow the sump and run down the ravine into the spring area and commingle with the spring waters and was used through the canal system by the owners of the right to the use of the spring waters.

In 1913, D. L. Thomas purchased the 1.90 acres from the county and in 1930 by title retaining contract he sold this to appellants along with other lands with the water

rights appurtenant thereto. Since then, appellants have owned these lands and the forty acres below on which the wells and the spring area are located, together with a large farm acreage and several homes which receive both domestic and irrigation water through respondent's canal and pipe line system. Mr. Carson was the watermaster for that system for many years before respondent was incorporated and thereafter was its president until shortly before this action was commenced when he resigned on account of this controversy. From 1905, when the Sunshine pumping operations ceased, to December 30, 1933, the well waters were allowed to run through the ravine into the spring area and were used exclusively by respondent and its predecessors except that there were herds of sheep and some cattle grazing in that neighborhood or being driven through that country which used these wells as a watering place and these sheepherders and dry farmers in that region filled their water tanks at these wells. Both D. L. Thomas and appellants during that period watered cattle, horses and sheep at these wells and filled water tanks there. The owners of the lands on which the wells were located did not use these waters during that period except as a part of the general public as a public watering place, and as part owners of the waters distributed through the respondent's canal and culinary water system.

Late in 1933, appellants as purchasers and D. L. Thomas' executor, he being deceased at that time, as seller of the land on which the wells were located, by written instruments leased the well waters to the Manning Gold Mining Company, which placed a pump on the well casing and pumped the waters through a pipe line for milling purposes to an old mine tailing at Manning about five miles from the wells. This operation continued from December 30, 1933 to August 1, 1937 when it was discontinued and the pump taken off and the pipe line dismantled. During this operation no water was allowed to escape into the ravine but it was all pumped to Manning; the owners of respon-

dent's spring waters knew of this lease and use of the well waters but made no protest. On March 23, 1936, during this pumping operation, Mr. Carson in compliance with the provisions of S. L. 1935, c. 105, sec. 100-5-12, filed an underground water claim to these well waters to establish that he had not waived his claim thereto. After the Manning operation ceased, the well waters were again allowed to flow through the ravine into the spring area where it was used by respondent and its predecessors and stockholders the same as it had been before the Manning operation, until some time in November, 1949. Prior to 1950, appellants fenced their land around this well and spring area and used it for a horse pasture, and some of the time during the winter after 1935, at the request of the State Engineer's office, the wells were capped or partially so, to prevent them from running to waste. Appellants claim that during this period they used the well water to irrigate about an acre of ground between the wells and the spring area but the court on ample evidence found on this question against such claim.

In November, 1949, appellants started to divert the well water from the ravine between the wells and the spring area by plowing a ditch from the south bank of the ravine toward the west apparently for the purpose of irrigating the land above the spring area and adjoining it on the north and at the same time they capped the wells and prevented them from flowing into the spring area. This the waters users under respondent's canal and culinary system violently protested, to no avail, and then commenced this action on February 1, 1950. Before this action was commenced, respondent on January 5, 1950 filed an application to appropriate these waters with other waters around the spring area which it proposes to develop. By the complaint respondent claimed that the well water came from the same source as the springs but the trial court found this fact against them.

The trial court held that the Sunshine Water Line Company acquired the right to the use of the well waters by drilling the wells and beneficially using the water therefrom but that it lost that right by abandonment and ceasing to use such waters for a period of seven years. It further held that the well waters were not appurtenant to the 1.90 acres which appellants purchased from Thomas and therefore they got no right to the use of such waters from him. It further held that by beneficial use of the waters from 1905 to 1933, respondent obtained a better right to this water than appellants without filing an application to appropriate them with the State Engineer and that respondent did not lose such right by allowing the pumping to Manning. It concluded that respondent under the facts of this case is entitled to complete its appropriation of such waters under such application.

Two of appellants' contentions require consideration: (1) That prior to 1935 the waters of artesian basins were held to belong to the owner of the ground on which they were located and not public waters nor subject to appropriation and under that doctrine appellants acquired a vested right to the use of these well waters which we should not now disturb. (2) That even under the present concepts of the right to the use of artesian well waters, appellants as the owners of the land on which the wells are located acquired the right to the use of such waters by merely diverting and beneficially using them in the Manning pumping operations without filing an application to appropriate but that respondent did not acquire such right without such application by using such waters from 1905 to 1933, because they did not own the land on which the wells were drilled but only diverted them out of a natural water course on the lands of others. We consider these propositions in the order stated.

Prior to 1935, the waters of artesian basins were considered to belong to the owner of the ground on which they were located as a part thereof and not public waters or

subject to appropriation. We applied what was called the doctrine of correlative rights and reasonable use, whereby we attempted to give to each land owner his relative proportion of the artesian basin waters. *Horne* v. *Utah Oil Refining Co.*, 59 Utah 279, 202 P. 815, 31 A. L. R. 883; *Glover* v. *Utah Oil Refining Co.*, 62 Utah 174, 218 P. 955, 31 A. L. R. 900; *Hanson* v. *Salt Lake City*, 115 Utah 404, 205 P. 2d 255. In 1935, we discarded that doctrine holding that the waters of artesian basins are subject to appropriation the same as surface streams. *Wrathall* v. *Johnson*, 86 Utah 50, 40 P. 2d 755; *Justesen* v. *Olsen*, 86 Utah 158, 40 P. 2d 802; *Hanson* v. *Salt Lake City*, 115 Utah 404, 205 P. 2d 255. In *Riordan* v. *Westwood*, 115 Utah 215, 203 P. 2d 922, 927, on the subject of applying this new concept, we said:

"'\* \* \* since the amendment to section 100-1-1, it is clear that the legislature intended, as far as it was legally possible, to declare all waters of the state whether under or above the surface of the ground and whether flowing or not, to be public property subject to the existing rights to the use thereof. Such has probably always been the law of this state regardless of this amendment. Of course the legislature cannot by such an enactment change from private to public ownership waters which by their nature were a part of the soil and as such belonged to the owner of the land on which they are found. Our concept of what waters were a part of the soil and as such belonged to the owner of the land has greatly changed since the early settlement of this state, and the question of what water is subject to appropriation must be determined on our present standards and concepts and we must treat that question as though our concepts and standards had always been as they are now."

Thus in each of those four cases we refused to determine the rights of the parties under the correlative rights and reasonable use doctrine so we will here determine the rights of these parties in the light of the new concepts.

Under the second proposition, we must determine the rights of the parties to the use of these well waters under the changed concept that they are public waters and subject

to appropriation. Since the effective date of S. L. 1903, c. 100, sec. 34,[2] it is established that the right to the use of the unappropriated flowing streams of this state cannot be acquired without first filing an application therefor in the State Engineer's Office. *Deseret Live Stock Co. v. Hoopiania,* 66 Utah 25, 239 P. 479; *Adams v. Portage Irr. Res. & P. Co.,* 95 Utah 1, 72 P. 2d 648; *Smith v. Sanders,* 112 Utah 517, 189 P. 2d 701, and *Hanson v. Salt Lake City,* 115 Utah 404, 205 P. 2d 255, 259 to 261. In the *Hanson* case, we discussed this question at length and recognized an exception to the above rule where, as in that case,

"* * * the right to the use of underground waters which prior to the *Wrathall* case were not considered the subject of an appropriation, but which were therein held to be subject thereto, could be acquired prior to the 1935 enactments * * * by merely diverting such waters from their natural source and placing them to a beneficial use * * *."

The reason for this exception was said to prevent hardship and injustice to underground water users who were misled into not filing such an application because no provision was made by the statute therefor, and neither the legislature, the courts, the Engineer's Office, the Bar nor the general public prior to 1935 intended to require such an application in artesian well cases.

The Sunshine Water Line Company acquired the right to the use of these well waters in 1900 by drilling the wells and beneficially using the waters but lost that right by

---

[2]S. L. 1903, c. 100, sec. 34, reads as follows: "Rights to the use of any of the unappropriated waters of the State may be acquired by appropriation, in the manner hereinafter provided, and not otherwise." This provision remained a part of the laws of the state until S. L. 1935, c. 105, sec. 100-3-1, amended it to read: "Rights to use of the unappropriated public waters in this state may be acquired only as provided in this title. No appropriation of water may be made and no rights to the use thereof initiated and no notice of intent to appropriate shall be recognized except application for such appropriation first be made to the state engineer in the manner hereinafter provided, and not otherwise."

abandonment and also by non-user from 1905 to 1912 under S. L. 1903, c. 100, sec. 50, before Thomas purchased the 1.90 acres from the county in 1913. From 1903 to 1933, these well waters were abandoned and allowed to run to waste through the natural ravine into the spring area and commingled with the natural spring waters and were diverted together into respondent's canal system and beneficially used by the owners of the waters of that system. If respondent's predecessors could acquire the right to the use of these waters under the exception in the *Hanson* case without filing an application to appropriate by mere diversion and beneficial use, then the decision must be affirmed; otherwise it will have to be reversed. We conclude that they do not come within this exception.

Respondent's predecessors did not own the land on which the wells are located, nor do they divert this water from the artesian basin. The driller of the wells diverted the water and later abandoned it and allowed to to run to waste into a natural water course and to commingle with the natural waters of the springs from which respondent's predecessor diverted it into their canal to a beneficial use. There is little difference between this situation and the case where water, after being once appropriated and used, is allowed to escape beyond the control of the original appropriator into a natural water course. The law is now settled in this state that in such case such waters are subject to being again appropriated by filing an application and diversion to a beneficial use and not otherwise, *Justesen* v. *Olsen*, supra; *Lehi Irr. Co.* v. *Jones*, 115 Utah 136, 202 P. 2d 892; *McNaughton* v. *Eaton*, 121 Utah 394, 242 P. 2d 570. In those cases only such waters were held to be subject to reappropriation as reached the natural channel or course from which it could be rediverted but the new appropriator could not obtain any right against the original appropriator to require him to waste his waters or make them available for use under the new appropriation, *Lasson* v. *Seely*, 120 Utah 679, 238 P. 2d 418; *Smith-*

*field West Bench Irr. Co.* v. *Union Central Ins. Co.*, 105 Utah 468, 142 P. 2d 866, on second appeal 113 Utah 356, 195 P. 2d 249; *Crescent Mining Co.* v. *Silver King Mining Co.*, 17 Utah 444, 54 P. 244. The difference between those cases and this one is that here the waters have been abandoned and the original appropriator has lost his right to interfere with the appellants' use of the waters. If the original appropriator had not abandoned or by non-user lost his rights to these waters and still could make a beneficial use of them and could thereby prevent the reappropriator from using them, the situation would be the same as in those cases. Under our concept of the law of artesian basins prior to 1935, no one could by appropriation and beneficial use acquire a right to such waters as against the owner of the land on which the basin was located but if the land owner allowed it to run to waste and it found its way to a natural water course it could be appropriated in the manner prescribed by law and as against every one but the owner of the lands where the basin was located such appropriator would obtain the right to the use thereof. Under the new concept, the only difference is that such waters are subject to appropriation in accordance with the law even as against the land owner where the basin is located. Here the respondent did not own the land where the artesian basin is located; it did not drill the well which diverted the water from the basin; it merely diverted such waters from a natural water course after they had been permanently diverted from the basin by the owner of the land drilling an artificial well who had allowed the waters to run to waste into a natural channel.

In the *Hanson* case, supra, we held that the right to the use of artesian well waters, which prior to 1935 were considered not subject to appropriation but by the Wrathall and Justesen cases were held to be subject to appropriation, could be acquired prior to that time by merely diverting such waters to a beneficial use and the filing of an application to appropriate was not necessary. In the *Hanson*

case, the owner of the land on which the well was located had drilled the well and beneficially used the water for many years; it did not involve an appropriation by a person who was not the owner of the land on which the well water was diverted from the artesian basin. Since respondent and their predecessors could have appropriated these waters in the statutory manner prior to 1935 under the old conception, they have not been misled by the old concept into not filing an application to appropriate these waters during the time that they used them from 1905 to 1933 and therefore they do not come under the exception announced in the *Hanson* case, and did not acquire the right to use these waters prior to 1933.

From December 30, 1933 to August 1, 1937, appellants leased these well waters to the Manning Gold Mining Company, which company pumped the entire flow to its mining and milling operations where all of such waters were beneficially used. This use commenced a little more ■ than a year before the *Wrathall* and *Justesen* cases and the 1935 statutes and amendments. At the time when these changes in concept occurred, appellants were the owners of the land on which the wells were located, they were the owners of the pipes and casings of the wells which diverted the waters from the artesian basin, and they were in possession of the diverting works and actually beneficially using the waters through their lessee. Under our concept prior to the 1935 change, they had the right to use those waters as they saw fit without filing an application to appropriate them and they had done everything that the law anticipated that they should do in order to acquire the ownership of those waters. On March 23, 1936, appellants filed in the State Engineer's Office an Underground Water Claim claiming the right to the use of these well waters pursuant to S. L. 1935, c. 105, sec. 100-5-12, thereby fully complying with all the statutory provisions in regard to such waters and indicating that they did not intend to abandon the right to the use of such waters, and the pump-

ing operation to Manning continued for more than a year after such filing. Up to the time this operation ceased, appellants came squarely within the exception recognized in the *Hanson* case.

Appellants did not lose their right to the use of these waters by abandonment or ceasing to use these waters from August 1, 1937 to November, 1949. While they did cease to use these waters during that period, there is no evidence that they intended to abandon or relinquish their right to the use of such waters. Nor did they forfeit their right to the use of such waters under S. L. 1935, c. 104, sec. 100-1-4, the statute governing abandonment and forfeiture of the right to the use of waters at that time, for that section expressly provides that such provisions shall not apply to underground or subterranean waters; such provision was removed from the statute on May 8, 1945, S. L., c. 134, sec. 100-1-4, less than five years prior to the commencing of this action on February 1, 1950. We conclude that the trial court erred in awarding the right to the use of these waters to respondent and not to appellants.

There is one more problem to be pointed out. Appellants' rights to the use of these waters were acquired by leasing them to the Manning Gold Mining Company for a mining use at Manning, Utah. They are now claiming the right to use them for domestic and irrigation purposes in their farms. Sec. 100-3-3, U. C. A. 1943 provides that any person changing or attempting to change the place or purpose of use without first complying with the provisions of that section

"shall obtain no right thereby and shall be guilty of a misdemeanor * * *." See *Big Cottonwood Tanner Ditch Co.* v. *Shurtliff,* 49 Utah 569, 164 P. 856.

Apparently such an application would be necessary in order for appellants to perfect their right to change the use of this water from the mining purposes at Manning to their present use for domestic and irrigation purposes on their farms.

238

Reversed with directions to enter judgment in accordance with the views herein expressed. Costs to appellants.

WOLFE, C. J., and McDONOUGH and CROCKETT, JJ., concur.

HENRIOD, J., concurs in the result.