# HANSON v. SALT LAKE CITY.

No. 7112.   Decided April 16, 1949.   (205 P. 2d 255.)

Rehearing Denied September 13, 1949.

See 67 C. J., Waters, sec. 273; 56 Am. Jur. 616. Subterranean and percolating waters, note, 109 A. L. R. 395.

*E. R. Christensen, Homer Holmgren,* and *A. Pratt Kesler,* all of Salt Lake City, for appellant.

*McKay, Burton, Nielson & Richards,* of Salt Lake City, attorneys for respondent.

WADE, Justice.

Plaintiff, Orson Hanson, respondent here, brought this action against defendant, Salt Lake City, appellant here, for injunctive relief and money damages. He claims that as a result of the city drilling a large well and pumping large quantities of water therefrom during the summer

of 1934 in the neighborhood of his artesian well, the flow of water therefrom was greatly reduced so that without the aid of a pump on his well it would not supply sufficient water to satisfy his culinary and irrigation requirements as it had previously done, and that to supply his needs he installed a pump on his well. He asked as damages the cost of installing the pump, cost of operating it, and that the city be enjoined from pumping water from its well. The court refused to grant injunctive relief but did award him the damages which he asked in the sum of $295.10, which includes a substantial amount of interest.

The plaintiff is the owner of about 24 acres of land located at about 5200 South and 1700 East, according to Salt Lake County numbering system, southeast of Salt Lake City. It is an "L" shaped piece of property, facing a county road called Spring Lane on the north, and Highland Drive on the east.

This well is the only source of culinary water for plaintiff's home; it was drilled in 1921. Prior thereto, there was another well only 60 feet deep which went dry shortly before this one was drilled. These two wells have supplied the culinary water for that home for 40 years prior to the time of the trial, in May, 1947. The first of these two wells was drilled after 1903. The present well is 260 feet deep, and until the city commenced pumping in August, 1934, it had always supplied about 50 gallons of water per minute, which was ample to supply the culinary needs of the home and water for the chickens and livestock and the dairy and to irrigate some land.

A three inch pipe brings the well water above the surface of the ground. From there a horizontal pipe extends about 7 feet in which the size of the pipe is reduced to 1 inch, from which the water flows into a 30 gallon barrel. From the barrel the water is piped on a downward slope a distance of about 25 feet through a 3 inch pipe into a ram, which uses the fall of the water from the barrel to

lift some of it about 32 feet into a tank. The water used to lift this water into the tank escapes into a ditch through which it runs onto the lands of others and sometimes is used for irrigation but is not thereafter used by plaintiff. The water is piped from the tank to plaintiff's house, barn, chicken coops and stock watering trough. There is a valve on the well through which the well water may be turned into the dairy house and used for cooling purposes and onto the lawn around plaintiff's house.

The summer of 1934 was an extremely dry one. In order to obtain irrigation water which it was obligated to supply to certain farmers, the city sank a large well on the banks of its canal at a point about 6000 South and 2100 East and about 1¼ miles southeast from plaintiff's well. This well was drilled to a depth of 500 feet, and was perforated so that it would drain the water from all the various depths where water was encountered. It was on higher ground than plaintiff's well and required a pump to bring the water to the surface. The city installed an electric pump thereon and commenced to pump on August 21, 1934, and continued to operate, with the exception of short intermittent periods, until October 17th of that year. It was also operated some in the summers of 1935 and 1936, but plaintiff's evidence was positive that the pumping only interfered with his flow during 1934. When the pump was operating it produced a flow of from 2 cubic feet per second to 10.24 c. f. s.; usually it produced around 8 c. f. s. Shortly after the city commenced operating its pumps, the flow of water from plaintiff's well decreased from 50 to about 4 gallons per minute. This quantity was insufficient to operate plaintiff's ram and supply the water necessary for the other purposes for which he had used it in the past. He thereupon installed an electric pump on his well.

The court found that the operation of the city pump on its well reduced the flow in plaintiff's well from 50 gallons to 4 gallons per minute. And, further, that such flow was insufficient to operate his ram or supply his needs for irri-

gation culinary purposes. It refused to enjoin the city from operating its pump but awarded plaintiff damages as stated above. From this award the city appeals. It contends that in pumping water from this well it violated no right of the plaintiff.

The evidence is undisputed that both of these wells tap a large interconnected subterranean or artesian water basin. It indicates that this basin exists in the pervious strata or layers under the surface of the earth at various depths, and covers an irregular area from north to south of about 12 miles and from east to west of about 6 miles. This basin is sealed by impervious strata on the east, south and west but to the north it has an outlet into the Great Salt Lake. The water in question enters the basin from the east at the foot of the Wasatch mountain range. West of the Wasatch range fault line there is another fault line running generally from the south to the north which breaks the strata through which this water courses through which some of the water escapes to the surface as springs. About 6000 wells have been drilled into this basin, in some of which the pressure is sufficient to cause the water to flow naturally to the surface and in others, pumps are required. Part of these wells were drilled prior to 1934 and others have been drilled since.

Generally, each well has a tendency to lower the static head pressure, or the height to which the water will naturally rise, of all the wells, in the basin. But since pressure is required to force the water through the strata of pervious materials and the movement of the water is slow, the direct effect of one well upon another cannot be traced for more than a distance of two and a half miles and then only where there are no natural interferences between the two wells in the artesian basin. Each well is said to have a cone of influence, or that within a circular shaped area around the well, in the absence of natural interference, each well tends to directly effect the static head pressure of all other wells within a distance in some cases as far from

the well as two and one half miles. The closer the wells are together the greater the effect one has on the other, and where one well is upstream, or the course of the movement of the waters of the basin is from it toward the other well, the upper well in the flow of the waters has a greater effect and effects the other for a greater distance away than where the conditions are reversed. There also may be pockets in the basin or natural interferences in the flow of the water from one to the other, so that two wells might be relatively close to each other without either exerting any appreciable effect on the other.

Data was introduced in evidence by both parties of the effect the pumping from the city well had upon the flow and the static head pressure of plaintiff's well, and a number of expert witnesses gave testimony on that question. There is no dispute that the pumping of the water from the city well greatly reduced the static head pressure and the quantity of water which would flow naturally from plaintiff's well in a given time. The expert testimony of both sides was to that effect and the records and charts of both sides demonstrated that within a few hours of starting the city pumps the flow in plaintiff's well was greatly decreased and that it returned practically to its previous flow within a few hours whenever the city pumps were not operating. It is reasonably certain that had the city not operated its pumps the natural flow of water from plaintiff's well would have been ample to supply his needs according to his previous usage.

On July 17, 1934, there was received from Salt Lake City, by the State Engineer's Office, an application to appropriate 10 cubic feet per second of underground water, which the city proposed to pump from a well to be drilled at the place where its well was later drilled. This application was not approved until January 11, 1935, after the decision in *Wrathall* v. *Johnson*, 86 Utah 50, 40 P. 2d 755. This action was commenced February 21, 1935. Plaintiff filed with the State Engineer's Office an Underground

Water Claim to the waters of his well, pursuant to the Laws of 1935, c. 105, section 100-5-12, on December 23, 1935, and the city filed a similar claim to the waters of its well on February 29, 1936.

At the time of the first settlement of this state in 1847, water was diverted from the mountain streams onto the ground which was the commencement of the use of water for irrigation purposes here. See Hutchins, Selected Problems in the Law of Water Rights in the West, 74. The courts of this state have always recognized the prior right to the use of the water in the one who first appropriated it to a beneficial use. See *Ib.*, and *Munroe* v. *Ivie,* 2 Utah 535. In 1866, Congress by 14 Stat. 253, Rev. St., Sec. 2339, 30 U. S. C. A. § 51, validated all vested and accrued rights to the use of water which are recognized and acknowledged by local customs, laws and decisions of the courts, and in 1870, by Stat. 218, Rev. St., Sec. 2340, 30 U. S. C. A. § 52, it made all patents, pre-emptions and homesteads subject to all vested and accrued water rights. By Laws of Utah for 1880, c. 20, Sec. 6 the territorial legislature passed an act which recognized that the right to the use of water for any useful purpose within reasonable necessity has vested and accrued whenever any person has

"diverted and used any of the unappropriated waters of any natural stream, water course, lake, or spring or other natural source of supply."

The State Constitution adopted in 1896, by Sec. 1, Art. 17, recognized and confirmed all existing rights to the use of any of the waters of the state for any beneficial or useful purpose. The Laws of Utah of 1897, c. 52, Sec. 8, provided for the posting of notice of intention to appropiate waters and for the recording of notice of such appropriation after it has been accomplished. It also provided for the recording of notice of appropriations which had been completed prior to that enactment.

By c. 100, Laws of 1903, the legislature made comprehensive provision for the regulation of water and water

rights and the procedure to be followed in making an appropriation of unappropriated waters among which were the following:

Sec. 34.

"Rights to the use of any of the unappropriated water of the State may be acquired by appropriation, in the manner hereinafter provided, *and not otherwise.* The appropriation must be for some useful or beneficial purpose, and, as between appropriators, the one first in time shall be first in right." (Emphasis ours.)

Sec. 47.

"The waters of all streams and other sources in this State, whether flowing above or underground, in known or defined channels, is hereby declared to be the property of the public, subject to all existing rights to the use thereof."

Sec. 49.

"Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this State."

These provisions remained practically unchanged until 1935, when the legislature on account of certain suggestions and the holdings in the cases of *Wrathall* v. *Johnson,* 86 Utah 50, 40 P. 2d 755, and *Justesen* v. *Olsen,* 86 Utah 158, 40 P. 2d 802, made substantial changes in the first two sections above quoted, and added other sections regulating the appropriation and use of the waters of subterranean and artesian basins. These provisions will be quoted more in detail later in this opinion.

From the earliest times this court has recognized that percolating waters were not subject to appropriation as a part of the public waters of the state. Such waters were said to be a part of the ground through which they passed and belonged to the owner thereof the same as the rocks, soil and other materials thereof to the lowest depth, and the owner thereof could use such waters as he saw fit. *Crescent Mining Co.* v. *Silver King Mining Co.,* 17 Utah 444, 54 P. 244, 70 Am. St. Rep. 810; *Willow Creek Irr. Co.*

v. *Michaelson,* 21 Utah 248, 60 P. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687. However, it has been held that under the early federal and state statutes and laws above referred to that where a party developed or collected percolating waters on the public domain and appropriated them to a beneficial use, or where percolating waters supplied the source of a natural stream which had been appropriated to a beneficial use during the time when the lands through which such water percolated were public lands, the later private owner of such lands could not rightfully interfere with such use of such waters to which they had been previously appropriated. See *Sullivan* v. *Northern Spy Mining Co.,* 11 Utah 438, 40 P. 709, 30 L. R. A. 186; *Herriman Irr. Co.* v. *Keel,* 25 Utah 96, 69 P. 719; *Peterson* v. *Wood,* 71 Utah 77, 262 P. 828.

In 1921, in the case of *Horne* v. *Utah Oil Refining Co.,* 59 Utah 279, 202 P. 815, 31 A. L. R. 883, and later in the case of *Glover* v. *Utah Oil Refining Co.,* 62 Utah 174, 218 P. 955, 31 A. L. R. 900, we held that subterranean and artesian basins of water were percolating waters and therefore not the subject of appropriation but belonged to the owners of the ground through which they coursed. We adopted the American rule of correlative rights and reasonable use as the law which governed the use of such waters in this state. On the petition for a rehearing in the first of those cases at page 306 of 59 Utah, and at page 825 of 202 P., we summarized the holding by saying that

"where the water is put to a beneficial use, each party in the artesian district, if the water is necessary for his use, is entitled to a proportionate share according to his surface area as compared with the whole."

These decisions were recognized as the law governing the use of the waters from artesian basins in this state until 1935, and there was nothing in the decisions of this court or in the statutes as they had been interpreted and understood up to that time which required a compliance with the rules governing an appropriation of unappropriated

waters in order to obtain the right to use such waters in this state.

In 1935 the cases of *Wrathall* v. *Johnson,* supra, and *Justesen* v. *Olsen,* supra, held that the law of appropriation applies to the waters of subterranean and artesian basins. The Horne case, supra, was not expressly overruled in those cases, but it was held that the law of prior appropriation was not involved in the Horne case. It is evident that in the later cases the court applied a rule of law which conflicts with the rule applied in the Horne case although the cases are not distinguishable on their facts. The only attempt to distinguish the later cases on their facts from the Horne case was to point out that the area alleged to be covered by the artesian basin in the Horne case was not as large as in the later cases. This is not a distinguishing fact which would justify a different rule of law. Nor do we understand that the prevailing opinion so held because every argument which was advanced in support of the appropriation doctrine would apply with equal force to the facts in the Horne case. However, if there was any distinction between the facts in the Horne case and the two later cases, those cases cannot be distinguished from the present case. We are in accord with the law as announced in the later cases to the effect that the waters of artesian basins are subject to appropriation.

These cases held that artesian basin waters were flowing underground in sufficiently defined channels to be included as the property of the public and subject to appropriation under sections 47 and 34, supra. Those sections were carried into R. S. U. 1933, as 100-1-1 and 100-3-1, respectively. By those decisions it was recognized that in the past neither the courts, the State Engineer's Office, nor the bar or public generally had construed those laws so as to cover this kind of water. The various opinions in view of this fact suggested various legislative changes in law. Accordingly, the legislature which was then in session, made

the following amendments and additions to the laws. See Laws of Utah, 1935, pp. 195-200, c. 105:

Section 100-1-1, R. S. U. 1933, was amended to read as follows:

"All waters in this state, whether above or under the ground are hereby declared to be the property of the public, subject to all existing rights to the use thereof."

Section 100-3-1, R. S. U. 1933, was amended so as to contain the following:

"Rights to the use of the unappropriated public waters in this state may be acquired only as provided in this title. No appropriation of water may be made and no rights to the use thereof initiated and no notice of intent to appropriate shall be recognized except application for such appropriation first be made to the state engineer in the manner hereinafter provided, and not otherwise. * * *"

In addition to making amendments to the existing statutory provisions governing the procedure to be followed in appropriating unappropriated waters so as to expressly cover underground waters the following sections were added: Section 100-3-22, requiring every person boring or digging wells or tunnels for the purpose of appropriating underground waters to report the result thereof to the State Engineer Section 100-3-23, granted the right of replacement to any junior appropriator whose appropriation may diminish the quantity or injure the quality of the waters of a prior appropriator at the sole cost of the junior appropriator. And Section 100-5-12, requires all claimants to rights to use underground waters to file notice of such claims with the State Engineer within one year after the approval of that act.

Under these laws and decisions had plaintiff acquired the right to use the waters of his well prior to the time when the city's well was sunk in 1934? The evidence establishes that plaintiff's first well was drilled about 1907, which was four years after the enactment of the regulations for the appropriation of water in 1903. In *Deseret*

*Live Stock Co.* v. *Hooppiania,* 66 Utah 25, 239 P. 479, section 34, supra, later Section 100-3-1, R. S. U. 1933, which provided that

"rights to the use of the unappropriated public water in the State may be acquired by appropriation, in the manner hereinafter provided, *and not otherwise,*"

was held to require that without compliance with the provisions of that act no person could acquire the right to the use of any of the public waters of this state, and that mere use of the waters without complying with the formal provisions of the 1903 law thereafter give the user no right thereto as against a later appropriator who complied with such provisions. This was a three to two decision written by Chief Justice Gideon and concurred in by Mr. Justice Cherry and by Mr. Justice Thurman who concurred in an extensive opinion, and wherein Justices Straup and Frick each dissented with an extensive opinion. If the law as decided in that case is governing here, then plaintiff acquired no right to the use of these waters because the city first made application to appropriate these waters with the State Engineer, and plaintiff as far as the record shows has made no such application.

However, in *Wrathall* v. *Johnson,* supra, Mr. Justice Moffat, in the prevailing opinion, concurred in by Mr. Justice Ephraim Hanson, and by Chief Justice Straup without comment on this point, said that the Hooppiania case was overruled. That case was decided on a demurrer and plaintiff's complaint expressly alleged that he had appropriated the water and applied it to a beneficial use prior to 1903, when the law governing appropriation of water was first enacted. It is conceded by everyone that prior to the enactment of that law the right to the use of the unappropriated public waters of this state could be acquired by appropriating them to a beneficial use without following any statutory procedure. So, in the Wrathall case, although the court purported to expressly overrule the Hooppiania case, that question was not before the court,

but there can be little doubt that this expressed the views of a majority of the court as it was then constituted, since Mr. Justice Moffat relied on Chief Justice Straup's dissenting opinion in the Hooppiania case. At least twice since the Wrathall case we have stated without discussion the law to be in accordance with the decision in the Hooppiania case. *Adams* v. *Portage Irr., Reservoir & Power Co.,* 95 Utah 1, 72 P. 2d 648; *Smith* v. *Sanders,* 112 Utah 517, 189 P. 2d 701. The 1935 amendment to Section 100-3-1, R. S. U. 1933, enacted immediately after the Wrathall decision and undoubtedly with this holding in mind, leaves no doubt that thereafter no right to the use of the unappropriated public waters of this state can be acquired without complying with the statutory requirements.

As previously pointed out prior to the Wrathall case, the courts, legislature, bar and the public in general apparently understood that the law of 1903 prescribing the procedure to be followed in order to acquire the right to use unappropriated public waters of this state, did not apply to underground water basins. All of the opinions in that case recognized this fact. There was a complete absence in the statute of any provision making such laws applicable to the appropriation of underground waters. No reference whatever was therein made to wells, tunnels or other underground diverting works. Of course, the reason for this was that it was considered that the right to the use of such waters could not be acquired by appropriation and beneficial use. Immediately following that decision the legislature amended the old statutes and enacted new provisions which clearly showed that it intended from then on that in order to acquire the right to use underground waters those statutory provisions must be complied with. The statute was expressly made to cover the sinking or drilling of wells and tunnels, and required a report to the engineer of all such future activities. The legislature also required the filing within one year of a notice of all claims to the use of underground waters, and made the failure

to do so prima facie evidence of an intention to abandon such claims. Laws of 1935, c. 105, Section 100-5-12. By making such requirement without expressly requiring that such claimants comply with all the provisions governing a new appropriation the legislature recognized that prior thereto the right to use such waters could be acquired by mere appropriation to a beneficial use without complying with the statutory requirements, and thus by implication validated all appropriations of underground waters made after the 1903 and prior to the 1935 law without compliance with laws governing appropriation where the claimants complied with the new law within the time provided therein.

The statutes of 1903 and those subsequent thereto regulating the procedure to be followed in appropriating public waters of this state, were made in order to make a record of the priorities of future appropriators, and of other facts which would aid in regulating the waters in the future. This was not a revenue measure, and the only interest of the state therein was to conserve and encourage the development and use of all the waters and insure a just and equitable distribution thereof among the appropriators. It is clear that the legislature did not intend, at the time of these enactments, that these statutory provisions should govern the appropriation of underground waters such as are involved in this case, because it did not understand that such waters could be appropriated. So it made no provision for such a procedure. Later this court held that such waters were subject to appropriation and then the legislature amended the provisions so as to provide for the appropriation of such waters. In the meantime many persons had appropriated such waters to a beneficial use, and no doubt such persons would have complied with the statutory regulations had the legislature made it clear that such was its intention. It would be a great injustice to hold that these people acquired no right to the use of such waters by appropriating them to a beneficial use, because they had failed to comply with statutory regulations which the leg-

islature at that time did not intend that they should comply with, and the courts had held were not applicable to their case. No one has been harmed by their failure to comply with these regulations.

We do not have to determine whether the doctrine of the Hooppiania case is correct or not because here the facts are different. We, therefore, conclude and hold that the right to the use of underground waters which prior to the Wrathall case were not considered the subject of an appropriation, but which were therein held to be subject thereto, could be acquired prior to the 1935 enactments and amendments of our statutes on that subject by merely diverting such waters from their natural source and placing them to a beneficial use and that the plaintiff had, prior to the filing of the application of the city with the State Engineer, acquired a vested right to the use of the waters flowing from his well to the extent that he had placed them to a beneficial use as hereinbefore indicated, and that by filing his claim to such right to use such waters in accordance with the 1935 statute he has established that right with a priority dating from his first use.

The city argues that it is not liable to plaintiff for the added expense caused to him as the result of its drawing the water from the basin and thereby lowering the static head pressure. On a surface stream, if a subsequent appropriator were to lower the level of the water of a stream so that the size of the stream which was diverted into a prior appropriator's diverting works was greatly diminished, and he was thereby put to an additional expense in order to obtain his water, the subsequent appropriator would certainly be liable for the added expense which he caused to the prior appropriator. To that effect this court squarely held in *Salt Lake City* v. *Gardner,* 39 Utah 30, 114 P. 147, 152. This case involved the waters of Utah Lake. Plaintiffs had previously appropriated all of the waters which flowed naturally out of that lake through the Jordan River, its only outlet, during the irrigation season and some water which had to be pumped therefrom.

Defendants made application to appropriate 40 c. f. s. during the irrigation season of the unappropriated waters of the lake, which it proposed to take out of the lake by means of a pump when necessary, and which would thereby lower the level of the waters of the lake and lessen the quantity of water which would flow out of the lake by gravitation, and according to plaintiffs' claim would thus interfere with their prior right and cause them additional expense in obtaining their water. It was clear that there was much unappropriated waters in the lake which would not flow therefrom by gravitation. We allowed the application but required the applicants to stand all the expense resulting to plaintiffs from the removing of the additional water from the lake, in doing so we said:

"* * * If it be held, therefore, that a subsequent appropriator of water need have no regard for the diverting means or methods of the prior appropriator, but may in fact or effect make prior appropriations of water unavailable with umpunity, then there is in fact no such a right as a prior right, but all rights may, at any time, be invaded or destroyed by a subsequent appropriator by simply making the diverting means used by the prior appropriator useless. To permit such an invasion of a prior right would, in effect, amount to an indirect taking of a prior appropriator's water. This neither the legislative nor the judicial power can allow without permitting confiscation of property rights.

*    *    *    *    *

"If all rights can be protected and preserved, a mere change in prior established means or methods of diversion, if possible, ought not to prevent the use of water which could otherwise not be beneficially applied. But, in our judgment, the risk of interfering with prior rights and the cost of any change in the prior appropriator's means or methods of diversion should be assumed and borne by the subsequent appropriator, and a court should in no case permit a subsequent appropriation unless all prior rights can by some feasible means be protected and maintained."

But it is said that the state is interested in the fullest conservation and highest development and utilization of all of its waters which is possible without endangering the supply. It is urged that if a subsequent appropriator in an artesian basin is required not only to lift his own water

out of the basin but to pay the added expense caused to all prior appropriators by his well lowering the static head pressure of the basin waters then the cost to the subsequent appropriator will soon become prohibitive and the waters of the basin cannot be developed and utilized to the extent that they could be without depleting the supply. See Hutchins, Selected Problems in the Law of Water Rights in the West, 174-177.

The above author discusses the Utah law as enacted and amended in 1935 with other similar state laws. He suggested that it contemplates complete development of the waters of artesian basins under supervision of the State Engineer and after thorough investigation, that the system is new and unhampered by outmoded precedents and ancient rights, that each appropriator should make his appropriation with the understanding that his rights are subject to the static head pressure being lowered in the interest of serving the most people and that when it is he must stand the expense of bringing his own water to the surface, that only in that way can the greatest development of the waters of the basin be obtained.

Although the 1935 laws are comparatively new many of the water rights in artesian basins are of long standing. In the Horne case, the Wrathall case and the Justesen case, previously discussed, the plaintiffs in each case claimed a water right dating prior to the turn of the century. So the suggestion that all appropriators under this law would make their appropriations with notice that when and if it became necessary in the opinion of the State Engineer for the fullest utilization of these waters to lower the static head pressure of the basin then any appropriator would have to stand his own expense occasioned thereby is now impossible because these appropriators' rights were established many years before this law was enacted.

Our 1935 water laws did not contemplate that the rights of prior appropriators would be limited as above suggested.

Section 100-3-23, Laws of 1935, now Section 100-3-23, U. C. A. 1943, provides that in cases of appropriation of underground waters,

"the right of replacement is hereby granted to any junior appropriator whose appropriation may diminish the quantity or injuriously affect the quality of appropriated underground water" but that "replacement shall be at the sole cost and expense of the applicant."

This clearly indicates the legislative policy that later appropriators shall stand all the expense which such appropriation causes to prior appropriators. The rights of the parties to this action accrued prior to the enactment of this law and are not governed thereby, but the legislative policy has persuasive force as to what is the correct rule to be followed.

The rule that the expense to a prior appropriator, caused by a subsequent appropriator's taking water from an artesian basin and thereby lowering the static head pressure, must be borne by the subsequent appropriator is not as bad as it may appear. While in general every well in a basin tends to lower the static head pressure of every other well in the basin still the direct effect of one well on another is only traceable within a cone of influence, and even within that limit there are often obstructions which prevent one well from affecting another. In many cases there is difficulty in determining that the later well does affect the flow in the prior one and that problem becomes more complicated where there are many wells in the same basin, but that is merely a question of proof, and the prior appropriator cannot succeed against the subsequent one unless he can prove his case. Even if it were shown that more water would be used if each appropriator were required to stand the expense of lifting his water to the surface regardless of priority, and no such showing has been made in this case, still that would be no reason to allow a subsequent appropriator to deprive the prior appropriator of his right to use the water as long as his method of diversion was a reasonably efficient one.

On the other hand, the suggested rule that each appropriator bear the expense of lifting his water to the surface regardless of his priority, may be disastrous to the prior appropriator. This is illustrated by the three cases from this court involving artesian basins. We refer to the Horne case, Wrathall case and the Justesen case. In each of those cases as in the present one, small home owners had discovered the basin and developed flowing wells therefrom, and many years later a large industrial concern, and in this case the city, which could realize a greater profit from the water than could the original appropriators, sank large wells, into the basins and began pumping large quantities of the waters out, thereby threatening to cut off the entire supply of the prior appropriators. If the rule prevails that each appropriator must pay his added costs of bringing the water to the surface caused by subsequent appropriators lowering the static head pressure, then in many cases subsequent appropriators may draw the water out of the basin so that the static head pressure is so low that the cost of bringing the water to the surface is prohibitive to the prior appropriator, and then the subsequent appropriator will be able to obtain all the water from the prior appropriator without paying a cent therefor. In each of our previous cases the court intervened to prevent such a result. Such a rule gives proper reward to the person who first discovers and develops the water and stabilizes his right, and is in harmony with the long established policy of this state that a later appropriation may not interfere with the use of water by a prior appropriation in the manner he has become accustomed to use such waters.

That the subsequent appropriator must bear the added expense of bringing a prior appropriator's water to the surface caused by the removal of water from an artesian basin by the subsequent appropriator is squarely decided in other western states. See *Pima Farms Co.* v. *Proctor,* 30 Ariz. 96, 245 P. 369; *Noh* v. *Stoner,* 53 Idaho 651, 26 P. 2d 1112; *City of Lodi* v. *East Bay Municipal Utility*

*District,* 7 Cal. 2d 316, 60 P. 2d 439. Except that all of the wells required a pump to bring the water to the surface, and the plaintiffs in those cases asked for an obtained injunctive relief, unless and until the defendant made plaintiff's water available to him at defendant's expense, those cases are not distinguishable from our case.

This is in harmony with the well established rule as to surface waters as pointed out in the Salt Lake City v. Gardner case, supra. As to surface waters, no one has ever seriously made the claim that a subsequent appropriator could deprive a prior appropriator of his water through the means of diversion which he established and make him pay an additional expense to get the water by a different means of diversion. In *Little Cottonwood Water Co.* v. *Kimball,* 76 Utah 243, 289 P. 116, we allowed an application to appropriate water, where the appropriator contemplated piping the waters of a stream from the place of diversion to the place of use and thereby saving a loss of water through seepage and evaporation and absorption by plant life. But there the applicant did not even claim that he had the right to require the prior appropriator to pay the cost of that water saving.

We conclude that the waters of artesian basins are subject to appropriation in this state and that the first appropriator obtains a prior right to the use of such waters over subsequent appropriators, and that includes his means of diversion as long as such means are reasonably efficient and do not unreasonably waste water. It follows that where a subsequent appropriator draws a sufficient quantity of water out of an artesian basin to lower the static head pressure of a prior appropriator's well so that additional costs are required to lift sufficient water from his well to satisfy his previously established beneficial use of such waters, the subsequent appropriator must bear the additional expense.

Here the evidence shows that only a small portion of the waters which came to the surface through plaintiff's

well when the ram was operating was lifted into the tank and used thereafter by him. The lift into the tank was about 32 feet and was accomplished through a ram by means of a 5 foot drop from the well. If the ram were one hundred per cent efficient it would require between 86 and 87 per cent of the water to lift between 13 and 14 per cent thereof into the tank. There was expert testimony to the effect that good rams have an inefficiency of about 17 per cent or more. So it is improbable that this ram would lift more than about 10 per cent of the water used in that process into the tank, the rest of that water would drain out into a ditch and thereafter would serve no further useful purpose to plaintiff. The ram was not always operated because at times the water was used for other purposes which did not require it to be lifted into the tank. The evidence showed that when the city pump was operating, the flow in plaintiff's well was reduced to a point where there was not sufficient volume to operate the ram and therefore plaintiff could not get his water into the tank to satisfy his requirements. It is not shown that there was not sufficient quantity of water to satisfy his requirements had the water which did flow naturally from his well been lifted into the tank.

During the time when the ram was in operation about 90 per cent of the flow of water of plaintiff's well was wasted, or not used for domestic or agricultural purposes. The only use made of such water was for the power purpose of lifting the other water into the tank. Under section 100-3-21, U. C. A. 1943, in times of scarcity the use of water for domestic and agricultural purposes are given a priority over the use for other purposes. In this state we recognize the importance that all water shall be used most beneficially and economically and that none shall be wasted. *Big Cottonwood Tanner Ditch Co.* v. *Moyle,* 109 Utah 213, 174 P, 2d 148, 172 A. L. R. 175. Usually, however, where an improvement is made in a system to save water the one who obtains the right to use the water saved thereby must

.pay for the improvement. *Little Cottonwood Water. Co.* v. *Kimball,* supra. But here we do not have to determine whether water can be used for power purposes when others who need its use for domestic or agricultural use must go without, nor whether a person will be allowed to waste water by an inefficient system which deprives others of the use of such wasted water. Here both parties did obtain sufficient water to satisfy their requirements and the ram was still used and operated after the pump was installed. But plaintiff claims to have been put to additional expense because of the operation of the city pump.

Plaintiff was allowed damages to cover the purchase price of a pump and electric motor, and the cost of the electricity to operate during the time that the city pump was operating in 1934. The only time that the operation of the city pump ever interfered with the natural flow of plaintiff's well sufficiently to require him to use this pump on that account was during 1934, still since that time and up to the time of trial in May 1947, a period of more than 12 years, the plaintiff has used and operated his pump to deliver his water, and has incurred the expense of furnishing electric power and has replaced the motor once in the meantime. In view of this fact, this pump must have some further utility in delivering the plaintiff's water than merely to overcome the effect of the operation of the city pump on the flow of his well because he admitted that no such effect had occurred since 1934, yet he has continued to operate his pump and pay the expense of operation and upkeep thereon up to the time of the trial. In other words, he asks the city to pay for an improvement installed in his system which he has used over a period of about 13 years, although the city's pumping affected the flow of his well for a period of only a few months. Under these circumstances he is not entitled to recover. The judgment of the lower court is reversed with directions to dismiss the action. Costs to appellant.

McDONOUGH, J., concurs.

PRATT, Chief Justice (concurring in result).

The issues under the pleadings of this case are as to an appropriation for culinary, irrigation, and stock watering purposes. However, under the evidence and argument submitted to this court on appeal the issues of the use of water for irrigation and stock watering purposes have dropped by the wayside, and the controversy has centered upon the culinary use, and the use of water for power purposes to raise the culinary water to the height of some 32 feet for use in the culinary water system.

The evidence indicates that sufficient water for culinary use arrived at or near the surface of the ground by natural pressure, so that the question is not that of the necessity of raising water for appropriation, but is one of the right to use additional water (over and above the amount necessary for culinary use) to make the culinary water available for distribution throughout plaintiff's culinary water system.

Does this not amount to a claim of appropriation of water for power purposes, and if it does, then how much was so beneficially used? Is there not a difference between supplanting the loss of natural pressure to get water up to the diversion point; and supplanting the manner of its use after diversion? It seems to me that we are discussing, to some extent, the latter in this case. In other words, and using an hypothetical case, if a water user has established a right to 4 or 5 gallons of water for culinary use, but has used 45 gallons to circulate that 4 or 5 gallons through his water system, and the evidence is that his use of so much water for power purposes is 50% or a greater per cent inefficient and wastage, can he acquire any greater right to water for such power purposes, than would eliminate the amount of the wastage? If he acquires a right to the culinary water, plus the water for power purposes in an amount that excludes the wastage, then the question may develop as to whether or not these two quantities arrive at the point of diversion by natural pressure. If they do

not, then we come to the picture that seems to be the main point presented by Mr. Justice WADE'S decision which deals with the right an appropriator may have to compel a subsequent appropriator to supplant the natural pressure sufficiently to produce at the point of diversion the quantity of water the first applicant has benefically appropriated.

What do some of the authorities say on this point?

*In re Water Rights of Deschutes River and Tributaries,* 134 Or. 623, 286 P. 563, at page 577:

"An extravagant and wasteful application of water, even though a useful project, or the employment of water in an unbeneficial enterprise, is not included in the term 'use,' as contemplated by the law of waters. (Citations) In the latter cases it was held, in effect, that one is entitled to use water only in such quantities and at such times as may be reasonably necessary for some useful purpose, either existing or fairly contemplated in the future, and cannot waste water even for a useful purpose. 'Use of water by any one in a legal sense is always qualified by the condition that it must be restricted to such quantity and time of employment only as may be reasonably necessary for the accomplishment of some useful purpose.' The circuit court held that, to allow the company to use continuously a volume of water, such as that claimed for carrying off debris, would be to deprive a large body of land that might be irrigated for agricultural purposes. This of itself, under the code, is a greater use than the use that might be made by the water, as claimed, for carrying off debris. We concur in this finding."

*Doherty* v. *Pratt,* 34 Nev. 343, 124 P. 574, at page 576:

"We think, also, it appears from the evidence that the defendants' point of appropriation and diversion is at the dam where Pratt creek intersects Woods creek, and that their prior right to waters of Woods creek should be determined as at this point. Conceding that defendants have a prior right to so much of the waters of Woods creek as will deliver 11 cubic feet per second on the west line of defendant Pratt's land, an amount of water should be decreed at the dam on Woods creek as will supply such an amount of water under reasonable and economical methods of diversion. The rule as to reasonable and economical use of water applies as well to methods of diversion as it does to the application of the water to the land itself. The topography of the country and the character of the soil through which water is conveyed to the point of use must, of course, be

taken into consideration in determining the amount of water to which an appropriator is entitled, but an appropriator has no right to run water into a swamp and cause the loss of two-thirds of a stream simply because he is following lines of least resistance. Such method of diversion would not be an economical use of the water providing another reasonable method, under all the circumstances, could be devised to avoid such loss, even though it occasioned some additional expense to the appropriator. It is as much the province and duty of the trial court to determine whether the methods adopted for diversion are reasonable and economical under all the facts of the case as it is to determine the amount of water required by the appropriator at the place of use. There is in most cases a certain amount of loss from the point of diversion to the place or places of use, and, as we have before indicated, this loss will vary according to local conditions. Where, however, in the absence of any showing whatever justifying it, there appears to be a loss of two-thirds of such a large volume of water in conveying it only about three miles, reasonable and economical methods of diversion will not be deemed to have been shown."

*Town of Antioch* v. *Williams Irr. Dist.*, 188 Cal. 451, 205 P. 688, at page 694:

"* * * By moving its pump a few miles up the river it could obtain water free from saline solution. * * * It is evident, from all these considerations, that to allow an appropriator of fresh water near the outlet of these two rivers to stop diversions above so as to maintain sufficient volume in the stream to hold the tide water below his place of diversion and secure him fresh water from the stream at that point, under the circumstances existing in this state, would be extremely unreasonable and unjust to the inhabitants of the valleys above, and highly detrimental to the public interests besides.

"Our conclusion is that an appropriator of fresh water from one of these streams, at a point near its outlet to the sea, does not by such appropriation, acquire the right to insist that subsequent appropriators above shall leave enough water flowing in the stream to hold the salt water of the incoming tides below his point of diversion."

*Tudor* v. *Jaca*, 178 Or. 126, 164 P. 2d 680, at page 686, 165 P. 2d 770:

"* * * The amount of water which has been applied to a beneficial use is, of course, a measure of the quantity of the appropriation. Waste of water must not be practised. Wasteful methods

common among the early settlers do not establish a vested right to their continuance. Such methods were only a privilege, 'permitted merely because it could be exercised without substantial injury to any one.' (Citations) The use must not only be beneficial to the lands of the appropriator, but it must also be reasonable in relation to the reasonable requirements of subsequent appropriators. * * *

"The best methods for the application of water to the land should be used. No person should be allowed more water than is necessary when applied by a proper system; this, in order that a large area may be made productive by the extended application of such water. All the rights adjudicated in these proceedings are subject to this rule. (Citation)."

### *Hough* v. *Porter*, 51 Or. 318, 98 P. 1083, at page 1102:

"It is also argued that since, under the old methods in use before the substantial depletion of the flow by subsequent appropriators, Hough and some others, by reason of the excessive water supply, with the aid of a few dams in the channels and sloughs, could irrigate with but little trouble or expense, the recognition by this court of the appropriations made by subsequent locators will thrust upon Hough and others, in order to avail themselves of the quantity awarded them, the necessity of changing their methods of application and use of the water by the construction of ditches, etc., at great expense, all of which would be avoided, were it not for the interference of such subsequent claimants. For this reason it is maintained that the rights of the later settlers and appropriators were acquired subject to the methods in use at the time of the inception of their interests. This feature, however, is similar in principle to that of the farmer who at first may have needed but 100 inches of water and yet constructed ditches carrying three times that quantity, using it in a wasteful manner, and which right he still insists upon by reason of the ditch, when first constructed, being of sufficient capacity to carry the excessive supply. It is well settled that such a claim cannot be successfully maintained. (Citation) It is true, however, that no certain method is necessary to constitute a valid appropriation, so long as the water has been applied to a beneficial use; and this may be done either by ditches or by other methods of diversion and application, such as the placing of dams in the streams and sloughs, and thereby overflowing the land, or subirrigating it, as the case may be. * * * But will it do to say, because in some cases irrigation was had by damming the sloughs, with but little expense and work, causing the large excess of water supply to spread over the premises, that the old methods, which had their origin when there was but little demand for water and its

supply correspondingly abundant, may be continued? In this arid country such manner of use must necessarily be adopted as will insure the greatest duty possible for the quantity available. * * * The wasteful methods so common with early settlers can under the light most favorable to their system of use, be deemed only a privilege permitted merely because it could be exercised without substantial injury to any one; and no right to such methods of use was acquired thereby.

"Owing to the little demand and large proportionate supply in use by those along Silver creek and its branches in the early 80's, together with the lack of general knowledge and experience on the subject throughout the state, wasteful methods at that time were, no doubt, common; but of recent years improved means throughout the West have come into use, and a scarcity of the supply has made a more economic use necessary. The result is that the law has become well settled that beneficial use and needs of the appropriator, and not the capacity of the ditches or quantity first applied, is the measure and limit of the right of such appropriators. (Citations.)"

*Tulare Irr. Dist.* v. *Linsay etc.*, 3 Cal. 2d 489, 45 P. 2d 972, at page 997:

"An appropriator, as against subsequent appropriators, is entitled to the continued flow to the head of his ditch of the amount of water that he, in the past, whenever that quantity was present, has diverted for beneficial purposes, plus a reasonable conveyance loss, subject to the limitation that the amount be not more than is reasonably necessary, under reasonable methods of diversion, to supply the area of land theretofore served by his ditch. The appropriator is limited to reasonable beneficial uses. A reading of the many cases on the law of appropriation indicates a gradual and consistent tightening of the rule measuring the rights of appropriators. The early cases measured the *appropriator's right by the capacity of his ditch*, but that rule has long since been repudiated in this state. * * * As the pressure of population has led to the attempt to bring under cultivation more and more lands, and as the demands for water to irrigate these lands have become more and more pressing, the decisions have become increasingly emphatic in limiting the appropriator to the quantity reasonably necessary for beneficial uses. (Citing cases) If the appropriator uses more than the amount so required, he gains no right thereto. An excessive diversion of water for any purpose cannot be regarded as a diversion for a beneficial use. In so far as the diversion exceeds the amount reasonably necessary for beneficial purposes, *it is contrary to the policy of the law and is a taking* without right and confers no title, no matter for how long

continued. (Citing cases) In determining what is a reasonable quantity for beneficial uses, it is the policy of the state to require within reasonable limits the highest and greatest duty from the waters of the state. * * * However, an appropriator cannot be compelled to divert according to the most scientific method known. He is entitled to make a reasonable use of the water according to the general custom of the locality, so long as the custom does not involve unnecessary waste."

*Hardy* v. *Beaver County Irr. Co.*, 65 Utah 28, at page 41, 234 P. 524, 529:

"* * * In fact, the appellant concedes the priority of the respondents' rights to the extent which we have indicated; its contention with respect to the same being only as to the amount of water which the respondents require and beneficially use on the land, for which the water had been appropriated during such period when applied in a reasonably efficient manner.

"Not only the expert witnesses called by appellant, but also the expert witness called by respondents themselves, testified that, with reasonably efficient systems of canals and laterals, the land on both the Milford and Beaver Bottoms, while seemingly unusual in some respects, can be irrigated in the usual manner. Such being the case, it is the duty of respondent so to prepare their land, by leveling or otherwise, that it may be irrigated with reasonable economy in the use of water, to provide themselves with reasonably efficient means for diverting and applying the water to their land * * * and to use the same in the customary manner, at the usual season of the year, to the end that the greatest possible use may be made of the natural resource."

If applicant is not asking for any water for power purposes—and his complaint rather indicates he is not—then the only question is whether or not the amount he does ask for, arrives at his point of diversion. If it does, and that seems to be the fact absent any claim of appropriation for power purposes, then as to how he raises it after appropriation, to a particular use, is his own business. It would seem that a decision upon a variation of location of diversion point is premature.

WOLFE, Justice (concurring in the result).

I concur in the decision portion of Mr. Justice WADE'S opinion, to wit, that the judgment of the lower court

be reversed with directions to dismiss the action. This result is reached evidently on the ground that the plaintiff's damage was wrongly measured since the city's alleged interference with plaintiff's rights was only for a few months in 1934. Mr. Justice WADE appears by implication to hold that since the pump was used only for a short time by the city, the lower court should not have charged the full cost of the pump to the city; that since, from the evidence, it can be inferred that plaintiff used the pump for about 13 years, not because of any interference by the city with the natural flow of the well, it must have been used for purposes other than to overcome the consequence of the city's acts. Seemingly, this would introduce a principle of charging to the city as damages that proportion of the cost of the pump as its use in combatting the consequences of the city's alleged wrongful impairment of the natural flow bears to the whole use during the life of the pump—a difficult formula to apply even if the plaintiff continued to enjoy the natural flow of the well during the time when the city was not pumping and assuming that no other wells were contributing to the impairment of his natural flow. However, I am not aware that the city complained of the measure of damages. It stood squarely on the proposition that it could not be charged with any costs incurred by the plaintiff in order to overcome the impairment of the natural flow caused by the city's pumps. But if we are to reverse because an incorrect measure of damages was used, the case should be sent back for a retrial accompanied by a rule for the guidance of the lower court as to the measure of damages.

Furthermore, if the lower court is to dismiss the case for the reason that the wrong theory of damages was employed, it appears to me that a great portion of the opinion of Mr. Justice WADE is dicta. There would seemingly be no need to discuss the difficult question of who, between prior and subsequent appropriators, should be required to bear the expense incurred by the lowering of the water

table. It would suffice if we are to order dismissal of the action, to state that, assuming the city was obligated to pay damages to the plaintiff, the same had not been assessed on the correct theory and hence the action must be dismissed.

The main purpose of the court's opinion is to lay down a rule as to whether an appropriator of underground water, by means of a well, should bear the costs which a prior appropriator had been put to in restoring the flow from his well which flow had been impaired because of the junior appropriator lowering the water table (and hence the static head) by pumping water from the common subterranean reservoir. While it appears to me that the writer of the prevailing opinion has unnecessarily extended the opinion by a long historical review of statutes and decisions relating to the appropriation of water in this state and other collateral matters, much of which was already set out in the recent case of *Riordan* v. *Westwood,* 115 Utah 215, 203 P. 2d 922, I do not now believe I am in disagreement with most that is said. However, I would not want to be understood as being in accord with the prior holdings of this court that waters percolating through private lands were a part of the land through which they flowed and hence, private waters. I do not think it is any more true than that the air flowing above private lands is part of the land over which it flows. The matter is one of degree. Percolating waters are not stationary. They flow from and into private grounds from other lands. We handed down a decision very recently in the case of Riordan v. Westwood in which we discussed the question of whether percolating waters on private lands were private or public waters. I paid my respects to the treatment of that matter in a concurring-dissenting opinion. I see no reason for repeating what I said there in this opinion. If any one is interested in my reasons for holding that all percolating waters were, since the Mormon settlers first came into the valley, public waters regardless of the extent or quantity

of their percolation, although not until 1935 were they brought under the administration of the State Engineer, I refer him to my opinion in that case. I here add one observation which I think strengthens the view that the case of *Willow Creek Irr. Co.* v. *Michaelson,* 21 Utah 248, 60 P. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687, should be overruled insofar as it held percolating waters were part of the land through which they seeped and if they seeped through private lands, they were private waters. The prevailing opinion mentions the case of *Horne* v. *Utah Oil Refining Co.,* 59 Utah 279, 202 P. 815, 31 A. L. R. 883, and *Glover* v. *Utah Oil Refining Co.,* 62 Utah 174, 218 P. 955, 31 A. L. R. 900, which held to the doctrine of correlative rights, i. e., the right of the owner of the land to that proportion of the subterranean pool lying under his lands. I agree with the conclusion of the prevailing opinion that the Wrathall and Justesen cases impliedly overruled the Horne case. But if these cases overruled the Horne and Glover cases, I see no reason why we should not overrule the Willow Creek case. If this court could, by the Wrathall and Justesen case, announce principles of water law in conflict with those announced in the Horne and Glover cases and thereby acknowledge, even though by implication, that theretofore judicially declared private waters were always in fact public waters and subject to appropriation *regardless of the quantity of the water lying under each owner's land,* and thus bring the law in line with the more modern view, increase the water available for the economic development of the state, it should do so. This would also avoid those questions which may arise by some owner of land claiming that waters on or under his land having been pronounced as private waters cannot by a statutory declaration be made public waters. We should not reiterate and perpetuate the error of the Willow Creek case in which percolating waters were held to be private waters—private waters being used in the sense that they *belong* to the owner of the land as distinguished from the concept that a land owner may have the use only so long

as he uses the water beneficially, the state always possessing the ultimate reversionary interest. The authority of the Horne and Glover cases is no stronger than the doctrine of stare decisis. While that doctrine is a salutary one for the stability of the law it is not to be followed slavishly in view of a better and different understanding of the subject matter in regard to which the doctrine is invoked, which time and experience uncover. In the case of water we now may see that there was no such conception of private waters in these arid states except as it was reduced to actual possession under a diligence right or statutory appropriation.

I now address myself to the real question in this case as outlined above. I do so because the opinion of Mr. Justice WADE is the court's opinion even though all but the statement of facts and the last paragraph may be dicta. Since it is the majority opinion it may be taken as the expression of the court as to the correctness of the principles of water law therein announced.

The first commandment relating to the water policy of this state is to use our public water to the utmost. By that I do not mean that it must serve the most valuable or the highest possible use. That is another matter.

The second commandment, a corollary of the first, is that beneficial use is the basis, the measure, and the limit of the use. Beneficial use does not mean the highest beneficial use. If there is a hierarchy of values in beneficial uses, the higher may be compelled to condemn the lower if the lower is prior in time.

The third commandment, a corollary of the second and like unto it, is: Thou shalt not waste water.

I realize that first in time is first in right both as to surface and ground waters. But I agree with Mr. Justice LATIMER that first in right does not mean that antiquated means of diversion is a part of that prior right.

Ground waters, unlike surface waters, are hidden. Geologists tell us that it is possible to determine the distribution, location and the density of the water-impregnated underground materials in a subterranean reservoir (really not a reservoir as commonly meant but in great part an extended mass of gravel, sands, clays, etc., impregnated with water which, because of the frictional resistance to flow is slowly forced by pressure between the particles of sand, etc.) and to obtain a fairly accurate inventory of our underground resources either flowing in underground rivers or existing in the interstices of a vast mass of water-impregnated substances.

In order that the state may obtain the widest possible use of waters it is necessary that these underground resources should be determined and inventoried and that as much empirical data as possible be preserved and in view of such data the number and use of wells be regulated in order that depletion does not out run replenishment or recharging. A time may be expected to arrive when depletion and replenishment must be in balance or slowly the reservoir will disappear and all the users suffer or some of the subsequent users may have to give way to prior users. This point has been called the safe yield point. So long as water in this underground valley reservoir is still seeping to waste from the west and north sides of the underground basin into the Jordan River and Great Salt Lake, it should be further exploited. However, if the time comes when the withdrawals of water from the reservoir continue to exceed the recharges which come through seepage from the canyon streams, rain and snowfalls on the mountains and bench terraces, we may expect much trouble, hardship and litigation.

Long before that time comes, if unfortunately by lack of foresight and regulation it does come, we will have this problem of regulating the means of transportation of ground waters to the surface. I do not think we should hold, in view of our overarching water policy, that at this stage of

our knowledge of the distribution and inventory of underground water resources, prior users gain a vested right in a means of diversion of water. This must be left flexible. As stated in the quotation from Mr. Hutchins' work, page 172, entitled "Selected Problems in the Law of Water Rights in the West," set out in the opinion of Mr. Justice Latimer,

"As will be noted in the discussion of reasonableness of an appropriative right, in Chapter 6, a method of diversion and use that is reasonable at one time or in one place may not be reasonable at another time or in another area."

Prior appropriators by first tapping the basin might reap the benefit of a static head sufficient to bring the water diverted to the surface, but to require all subsequent appropriators to preserve this means of bringing the water to the surface would be to require them to preserve the static head, and thereby prevent the widest use of that underground water, or introduce impractical problems of allocating among numerous subsequent appropriators the amount of impairment each caused to the static head of a prior user or users. I think the tendency is, even in truly artesian basins ("artesian" accurately used applies to water which on being tapped, naturally rises to the surface although the term is loosely used to apply to any area where deep wells are drilled and water is pumped) to require all users to put in pumps in order to prevent waste. For these reasons I concur with the dissent of Mr. Justice LATIMER. I rest my dissent on the grounds mentioned above and those given by him. However, I desire tentatively to express the view that the point of diversion is not at the surface where the water either by its own static head or by artificial means emerges, but at the point or points where the appropriator takes it from the underground source.

I have doubt as to whether an appropriator of underground water appropriates static pressure or head as a concomitant of the water he appropriates, even when he

appropriated by diligence before the statutory method was in force.

The cases of *Pima Farms Co.* v. *Proctor*, 30 Ariz. 96, 245 P. 369; *Noh* v. *Stoner*, 53 Idaho 651, 26 P. 2d 1112; *City of Lodi* v. *East Bay Municipal Utility Dist.*, 7 Cal. 2d 316, 60 P. 2d 439, are not to the contrary. None of them deal with the situation we have here. While the over-arching principles of water law, in arid states, are reducible to the paramount policy of making public waters serve the broadest possible use, and its corollary principle that beneficial use shall be the basis, the measure, and the limit of all rights to the use of water, the matter of accomplishing this largest possible use and still preserving vested rights must vary from case to case according to the physical situation and practical means under that situation to accomplish the desideratum.

In *Pima Farms Co.* v. *Proctor*, supra, the problem was one of preserving the use of the plaintiff's *pumping* machinery which had been adjusted once to meet the changing conditions due to defendant's *lowering* the water in the underground basin. The defendant had contended that

"the 'right' subsequent appropriators must respect and not injure or impair is a right to a use of so much water as he may have appropriated and beneficially applied, and has no reference whatever to the means employed by him to divert such water." [30 Ariz. 96, 245 P. 371]

The court held that

"if the first appropriator's rights are superior under the law, they should be made so in fact" and that "the practical effect of allowing defendant's contention would place the burden on the senior appropriator of adjusting and changing his diversion means to conform to the necessities and convenience of the junior appropriator, and make his rights subservient to the rights of the latter."

Very pertinent to my thesis is the ground on which the Arizona Court distinguished the facts of *Schodde* v. *Twin Falls Land & Water Co.*, 9 Cir., 161 F. 43, 8 C. C. A. 207;

*Id.,* 224 U. S. 107, 32 S. Ct. 470, 56 L. Ed. 686. In that case the prior appropriator had

"employed the energy of the current as his motive power to lift the water for distribution onto his land before dam was built."

Such use as appurtenant to his water right for consumption purposes was denied. The Arizona court remarked

"The Circuit Court of Appeals, by process of reasoning entirely satisfactory to the Supreme Court, and it seems to us unobjectionable, concluded that plaintiff *did not appropriate with his water right the energy of the current* * * *." (Italics ours.)

While the claim of a right to use the current of a stream to turn a paddle wheel in order to raise water may involve the conception of riparian rights, the claim of use of static pressure of water involves the concept of right to use the water for a power purpose. Even though such pressure were used before 1903 as a means of forcing underground water to the surface, I do not think the plaintiff can be thought of as having appropriated the water for that purpose as incident to his appropriation for consumptive purposes.

The case of *Noh* v. *Stoner,* supra, involved the use of pumps by neighboring users. The question was as to who, between the prior and subsequent user, should pay the cost of the prior user being required to put in a deeper and more powerful pump where the subsequent user had depleted the volume of the underground water to a level below that of the ability of the prior user's pump to maintain his supply. That case did not involve the question of the depletion of static pressure. It involves the question of the depletion of water to a level below the respondent's diversion point.

In the case of *City of Lodi* v. *East Bay Municipal Utility District,* 7 Cal. 2d 316, 60 P. 2d 439, the City of Lodi derived its water from an underground basin which was fed from water from the Makelumne river seeping through

very porous soil. The Utility District and the Pacific Gas and Electric Company, by a series of upper reservoirs, proposed to conserve the runoff water which varied greatly during different spring seasons and was mostly wasted into the sea. But by holding back the flood river waters, which were the source for the replenishment by percolation of the underground basin, the level of that basin, as the supply for the city would have been dropped to a point where the city could no longer be assured of sufficient water. This case did not involve the question of static head. It involved the question of depletion of supply through depletion of source water.

Naturally when supply is depleted in any vessel large or small, static pressure is lowered. But it does not follow that, because the static pressure is lowered, the user has been legally injured if he can by reasonable means still obtain the amount of water he appropriated. Under the policy making as much water as possible available for use and encouraging its use, he cannot insist that the static pressure existing at the time of his appropriation be maintained, or that a subsequent appropriator pay the cost of pumping apparatus to take the place of the lost pressure. He must, as Mr. Justice LATIMER states, use that means of transporting water to the surface which serves the above policy if under the circumstances and period, and in view of the rights of other appropriators, both prior and subsequent, it is a reasonable method.

LATIMER, Justice (concurring in the result).

I agree with the results and concur in much of what is said in Mr. Justice WOLFE'S preliminary discussion. However, I find myself unable to concur in the reasoning of the prevailing opinion.

Mr. Justice WADE, in this decision, sets forth most of the facts concerning this litigation. There are, however, other facts which I believe to be important to my decision,

and I, therefore, not only emphasize some of the facts mentioned by Mr. Justice WADE, but supplement those given by him with others that I believe should be stated.

From his statement of facts, it will be observed that approximately 6,000 wells have been driven in what is designated as the Jordan River Valley underground water basin. According to the estimate of Dr. Marsell, a recognized Professor of Geology, the average flow of all wells in the area is 19 gallons per minute. This basin is approximately 12 miles north and south by 6 miles east and west. It is sealed on three sides by impervious strata, but on the north side, there is an outlet which permits the waters of the basin to escape into Great Salt Lake. According to the information given by Dr. Marsell, a volume of water of not less than 165 cubic feet per second, is wasted by being permitted to escape through this outlet. It is the opinion of Dr. Marsell that the basin is not fully developed, and that all the water will not be beneficially used until such time as the flow from additional wells in the area is sufficient to use the water that now escapes through the northern outlet. It is his further opinion that the use of the water now going to waste can be obtained without injury to the present well users, except as each new well may reduce the static head in the wells then in use.

I see no reason to disagree with Mr. Justice WADE'S statement of the law as it exists in the state at the present time, and I concede that under previous holdings of this court, a prior appropriator of artesian water has been protected in the amount of water appropriated and beneficially used by him. However, I believe that under present conditions, the doctrine announced in *Justesen* v. *Olsen*, 86 Utah 158, 40 P. 2d 802, should be limited to those cases where the prior appropriator is using a reasonable means to divert his water.

All authorities agree that when a new well taps the waters of an underground artesian basin, it lowers the

pressure and reduces, in some degree, the flow of every other well drawing water from the cone of influence. The record in this case shows that the flowing of the Salt Lake City well directly affected some of the wells within a distance of 2½ miles and undoubtedly reduced the pressure throughout the whole basin. If such is the case, then any well subsequently sunk in this artesian basin would interfere with the rights of all other well owners.

The effect of Mr. Justice WADE'S decision is to require the subsequent appropriator to do one of three things for all prior appropriators who have suffered any loss of pressure. These are: Sink the wells deeper, furnish equipment for pumping, or furnish to each the amount of water that has been taken away. In this particular basin, the cost to adopt any one of these methods, would be prohibitive. In many instances, the amount of diminution would be slight, but the principle announced would require the subsequent appropriator to maintain the pressure for, or get water to all prior appropriators. The cost of equipment or the impossibility of transporting small quantities of water great distances, would prevent the subsequent user from being able to comply with such requirements.

Mr. Wells A. Hutchins, in his book, "Selected Problems in the Law of Water Rights in the West," analyzes the cases from western jurisdictions and has this to say about the appropriation of ground water. I quote from page 168:

"The circumstances surrounding the diversion of ground waters make the question of protection of the method of diversion more important to the water user than is generally the case when he diverts from a surface stream. Ground waters, to be made available for use, must be brought to the surface from depths which range from a few feet to hundreds of feet. Unless the ground water is under pressure sufficient to raise it naturally to the surface, pumping must be resorted to, and the cost of equipment and power for pumping increases with the height to which the water must be lifted, that is, it increases with the depth at which the water table stands during the period of pumping. Each additional draft on the groundwater supply tends to lower the level of the water table, and in case of artesian water (ground water under pressure), each addi-

tional well results in some lowering of the height to which the water will rise naturally in the well. Consequently, as development in a ground-water basin progresses, the earliest users find it necessary to deepen their wells, install larger pumps, and use more power to raise a given quantity of water to the surface than was the case when they first began to use the ground water. The question arises as to what protection, if any, the first user is afforded in maintenance of the conditions under which he first began to divert the ground water, or as to whether he is entitled to compensation for the additional cost of pumping if later claimants are to be permitted to share the common water supply."

This quotation emphasizes wherein I disagree with the conclusions reached by Mr. Justice WADE. It is my belief that the development of artesian water in this state has reached a point where we should only protect the prior appropriator when his means of diversion are reasonable and consistent with the state of development in the area in which he obtains his water.

I concede that this court has held that an original appropriator from a stream or surface of water has a right to continue the method of diversion which he adopts. See *Salt Lake City* v. *Gardner,* 39 Utah 30, 114 P. 147, 149. This principle has also been held to apply to underground water, but I believe this is the first time it has been challenged under a state of facts which indicate that the means of appropriation may not be reasonable.

Quoting again from Mr. Hutchins' work on page 172, he makes the following statement:

"In the California, Oregon, and Federal decisions the facts of which are above outlined, perpetuation of the particular methods of diversion insisted upon would have been unreasonable in their effect upon later appropriations and not in the public interest. The other decisions all upheld the right to a reasonable method of diversion; none of them sanctioned the continuance of a method which was unreasonable in relation to other appropriators under the circumstances involved; and it is noteworthy that certain decisions intimated that the junior appropriator, where the senior appropriative diversion was considered reasonable, might be allowed to solve the situation at his own expense. Where an appropriator's method of

diversion is reasonable, in the light of all the circumstances including long-established customs in the community, it is doubtful if he would be required, in many jurisdictions, to submit to substantial expense to accommodate junior appropriators. As will be noted in the discussion of reasonableness of an appropriative right, in chapter 6, a method of diversion and use that is reasonable at one time or in one place may not be reasonable at another time or in another area."

If the principle of requiring the prior appropriator to use a reasonable means of diversion is not applied in this particular case, we have a situation where an appropriator of water can sink a well and obtain a flow of 50 gallons per minute and literally require approximately 74,250 gallons per minute to be wasted. To further emphasize the waste that confronts us in this case I desire to point out that plaintiff uses a large part of the water for the purpose of lifting a smaller part to the top of a silo by means of a ram. All of the water which is used to operate this ram is permitted to run off of plaintiff's land and may be wasted. There is some intimation in the record that some other parties might use this water but no evidence is found in the record dealing with necessity or use by any other user. Be that as it may, a large volume of water will be permitted to go to waste if plaintiff is entitled to have the water level and pressure maintained so as to assure his flow of 50 gallons per minute. I believe it inadvisable to throw a cloak of protection around a right that can be corrected by a small expenditure by the owner when the cloak chokes off the expansion and development of the state's resources. We are not confronted with a state of facts like those existing in Wrathall v. Johnson, or Justesen v. Olsen. In those matters only a limited number of appropriators were involved. Under those conditions it might be concluded that a prior appropriator could rely solely on pressure for delivery of his water. If we, however, change those facts to the ones existing in the present case, we see a reason for modification of this rule. Here we have six thousand well owners in a large populated area, some two-

hundred thousand residents of Salt Lake City and many more in the county are dependent upon an adequate water supply, the population of the county is increasing rapidly, further expansion is expected and water is scarce. From these facts I conclude that an appropriator in this basin should not be entitled to rely on pressure alone when other methods can be used at little expense.

Mr. Thomas. G. Thompson of the United States Geological Survey, makes the following statement concerning the endangering of the supply of the prior appropriator:

"Another important fact, which is not generally appreciated, is that, as stated by Mr. Conkling under 'Administration: Underground Water,' it is impossible to take water from any well either by natural flow from an artesian well in which the static head is above the surface, or by pumping from wells in which it is below the surface, without causing a drop in head, or static level, beneath the territory surrounding the well. Theoretically, this drop in head should extend ultimately to the outermost borders of the groundwater body under consideration. The loss of head resulting from the withdrawal of water from several wells if within the cones of influence of each other, may be significant in amount over a large area, perhaps many square miles. Some loss of head cannot be avoided even if the quantity of water withdrawn is only a small part of the total safe yield of the aquifer; and if a considerable part of the safe yield is to be obtained in some regions there must be a considerable loss of head. It should be distinctly understood, however, that loss of head does not necessarily mean that the permanency of a well owner's supply is endangered. * * *"

The facts of this case should be considered with this principle in mind. When the plaintiff's supply of water was decreased by operation of the city pumps at capacity, he still had four to five gallons of water flowing out of the faucet of his well. No complaint is made that water was not available or that the supply was endangered. Plaintiff's only complaint is that he was deprived of the pressure necessary to obtain the same quantity he had before. The issue concerns only free delivery of the water. Reduced to its simplest form the question is: In a highly developed metropolitan area, can an early appropriator insist, not

only that he is entitled to the quantity of water he has always obtained, but can he, to the exclusion of all subsequent appropriators, insist on his means of diversion regardless of the fact that the progress and development of the area has rendered his means outmoded and unreasonable? I think not.

I appreciate the fact that my holding has a tendency to deprive the prior appropriator of the results of his development. However, it is not as harsh as it first appears. Had the plaintiff in this case, when he drilled his well in 1921, been faced with the necessity of maintaining the pressure in the artesian basin, or furnishing prior appropriators with additional equipment, he would have been unable to obtain his water. Undoubtedly, his well released some of the pressure existing in the basin at that time.

If we are to protect the prior appropriator under all circumstances, then the prior appropriator can require damages from every subsequent appropriator and each subsequent appropriator in turn, can require damages from all subsequent appropriators, until the last one would have to pay tribute to all. If the waters of the Jordan River Basin are to be utilized to the fullest extent, then it must be recognized that some lowering of the water table or static head will result when each well is drilled; and that such a result cannot be avoided if use is to be made of the water now going to waste. If the present appropriators of artesian water have the right to retain the pressure now present in the basin, then I see no escape from the conclusion that in the future, it will not be economical and feasible to drill wells in this basin.

Moreover, unless we adopt the principle that prior appropriators must use reasonable means of diversion, I am unable to determine how the State Engineer can carry out the functions delegated to him by the 1935 Legislature. He is authorized to permit citizens of this state to appropriate unappropriated waters and under the evidence of

Dr. Marsell, there exists a minimum of 165 cubic feet per second of unappropriated water in this basin. If the State Engineer must require subsequent appropriators to pay tribute to all prior appropriators of water in the area, then we cannot reasonably expect newcomers to assume this burden.

The record does not convince me that the method of diversion used by the plaintiff in this case is reasonable under the facts and circumstances. I, therefore, feel that the cost of making his diversion reasonable should be borne by him and not by the city. He should be protected in the quantity of water he has appropriated and is beneficially using, but I believe that even though his original means of diversion may have been reasonable, it now should be changed to one consistent with the developments in the area, and that he should be required to assume the additional costs imposed on him by virtue of the changed conditions.